FILED by _____ D.C.
ELECTRONIC

**DEC. 1, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)

CARNIVAL CORPORATION, CARNIVAL
PLC and CUNARD LINE, LTD.,

        Plaintiffs,

v.

ROLLS-ROYCE PLC, ROLLS-
ROYCE AB, ROLLS-ROYCE NORTH
AMERICAN HOLDINGS, INC., ROLLS-
ROYCE COMMERCIAL MARINE, INC.,
CONVERTEAM SAS f/k/a ALSTOM
POWER CONVERSION SA, CONVERTEAM,
INC. f/k/a ALSTOM POWER CONVERSION,
INC, ROLLS-ROYCE AB and CONVERTEAM
SAS, jointly and severally, d/b/a THE MERMAID
CONSORTIUM,

        Defendants.

_____/

CASE NO.
**08-23318-CIV-SEITZ/O'SULLIVAN**

## COMPLAINT FOR DAMAGES

    Plaintiffs, Carnival Corporation, Carnival PLC and Cunard Line Ltd. (collectively referred to as "Carnival"), bring this Complaint against Defendants, Rolls-Royce PLC, Rolls-Royce AB, Rolls-Royce North American Holdings, Inc. and Rolls-Royce Commercial Marine, Inc. (collectively referred to as "Rolls-Royce"), Converteam SAS f/k/a Alstom Power Conversion SA, Converteam Inc. f/k/a Alstom Power Conversion Inc. (collectively referred to as "Converteam" or "Alstom"), and Rolls-Royce AB and Converteam SAS f/k/a Alstom Power Conversion SA, jointly and severally, d/b/a The Mermaid Consortium, and state as follows:

**Nature of the Action**

1.       This is an action by Carnival for damages in excess of $100 million arising from

the Defendants' marketing, sale, design, construction, servicing and repair of a vessel

propulsion system for Carnival's ocean liner, the QUEEN MARY 2 ("QM2").

2.       The damages were suffered as a result of the Defendants having defrauded and

deceived Carnival into the selection, acceptance and continued use of a defective

propulsion system.  This propulsion system was marketed by the Defendants as the

Mermaid pod propulsion system (hereinafter the "Mermaid").  It was touted by the

Defendants as the best pod in the industry and also as a proven, well-tested product.

These representations were false.  The Mermaid turned out to be a defectively designed

and built product which was in fact at an experimental stage of its development and

seriously under-designed when it was put into operational use.

3.       From the beginning, Mermaid pods on cruise ships experienced serious problems

causing repeated interruption and restriction of operations on the cruise ships on which

they were installed.  The selection of Mermaid pods for use on the QM2 was made

shortly before repeated failures and other problems began occurring on other Mermaid

pod equipped cruise ships.  These Mermaid pod problems were well publicized and

caused a great deal of concern at Carnival.

4.       In fact, several cruise ship operators have instituted legal actions that are currently

proceeding in Florida courts against these same defendants for similar failures of the

Mermaid pods on their vessels. Royal Caribbean Cruise Lines and Celebrity Cruises are

litigating the merits of similar causes of action in the 11th Judicial Circuit in and for

2

Case 0:08-cv-23348-PAS Document 1 Entered on FLSD Docket 12/02/2008 Page 3 of 45

Miami-Dade County, case no. 03-18350. And Regent Seven Seas Cruises has been pursuing a claim in this Court (Case no. 06-22347-PCH) for problems occurring with the Mermaid pods on one of its cruise ships, the SEVEN SEAS MARINER.

5.     Carnival was prepared to delay delivery of the QM2 because they were not convinced that the Mermaid pods were fit for their purpose as a propulsion system. But the Defendants claimed, as each problem arose, that each was an isolated incident, that they had carefully studied the problem, and that they could fix the problem so it would not occur again. The Defendants also repeatedly represented to Carnival that the problems experienced on other vessels would not occur on the QM2 due to an advanced pod design and improved components used in the pods.

6.     Based upon these representations and assurances from the Defendants, Carnival agreed to accept delivery of the QM2 with the Mermaid pods subject to the provision of extended guarantees and indemnity agreements for any potential pod failures. The Mermaid Consortium was quick to appease Carnival and provide these guarantees for the Mermaid pods, at least in name, but failed to designate the applicable terms for the guarantees and, as time has proven, with no intentions of ever honoring the guarantees when problems subsequently arose.

7.     Problems with the Mermaid pods on the QM2 began shortly after the ship was put into operation and have continued to date. The Mermaids are simply defective and do not function as it was represented that they would. Most importantly, it is now also clear that the Defendants have known about this situation all along and that they have deliberately conspired to mislead, deceive and defraud Carnival into believing otherwise. The

3

Defendants either do not know how to fix the Mermaids, or they do not want to spend the money to redesign the Mermaids and/or replace them. As a result, Carnival has sustained damages presently estimated to be in excess of $100 million (and growing) due to the costs of repairs, lost revenue, maintenance and monitoring. Carnival will continue to suffer damages in the future because the defective Mermaid pods have not been satisfactorily fixed and continue to suffer numerous problems resulting in significant losses to Carnival.

8.      This lawsuit brings causes of action pursuant to the laws of Florida and the general maritime law for: breach of implied warranty of merchantability; breach of implied warranty of fitness for a particular purpose; breach of warranty of workmanlike performance; fraud in the inducement; fraudulent misrepresentation; negligent misrepresentation; deceptive and unfair trade practices; negligent testing, inspecting, repairing, and/or servicing; negligent professional services; false, misleading and deceptive advertising and sales; and civil conspiracy.

## Jurisdiction, Venue and Parties

9.      This is an action for damages in excess of seventy-five thousand United States dollars ($75,000.00) against all defendants exclusive of interests, costs and attorneys fees.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that all parties are diverse.

11.     The venue for this action is proper in this District as the wrongful and unlawful conduct of the Defendants and/or transactions giving rise to the causes of action occurred

4

and/or had substantial effect within the Southern District of Florida and one or more of the Defendants:

    a. Does business within the Southern District of Florida; and/or

    b. Committed unlawful and tortious conduct within the Southern District of Florida and damaged Plaintiffs within the Southern District of Florida; and/or

    c. Actively solicited business in this District; and /or

    d. Was resident in this District during the time of the transactions and tortious acts complained of; and/or

    e. Held itself out as a company licensed or registered to do business and doing business within this District.

12.     Plaintiff Carnival Corporation is a foreign corporation authorized to do business in Florida and with its principal place of business within the Southern District of Florida, particularly in Miami, Florida. Carnival is in the cruise ship industry and is the ultimate parent corporation of Cunard Line Ltd.

13.     Plaintiff Carnival PLC is a foreign corporation authorized to do business in Florida and currently conducting business in the Southern District of Florida. Carnival PLC is the registered owner and operator of the QM2.

14.     Plaintiff Cunard Line Ltd. is a foreign corporation authorized to do business in Florida and until 21st December 2004 conducted business in the Southern District of Florida. On 21st December 2004 all the business of Cunard was transferred to Carnival plc. Cunard maintained its principal place of business in Miami, Florida for much of the time period relevant to this claim. The QM2 is a luxury ocean liner built specifically for

use in the passenger trade. Since 2004, Carnival's use of the QM2 includes the operation of voyages calling at Florida ports and carrying Florida as well as non-Florida passengers and crew. The destination of the QM2's maiden voyage was Ft. Lauderdale, Florida.

15.     Defendant Rolls-Royce, PLC ("RRPLC") is a British business entity with its principal place of business in England. RRPLC has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. RRPLC specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services in Florida.

16.     Defendant Rolls-Royce AB ("RRAB") is a Swedish business entity with its principal place of business in Kristenehamn, Sweden. RRAB formerly was known as Kamewa AB. RRAB has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. RRAB held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion

products and services in Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout this State. RRAB has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

17.    Defendant Rolls-Royce North American, Inc. ("RRNAH") is a Delaware corporation with its principal place of business in Chantilly, Virginia. RRNAH has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State and with a registered agent in Florida. RRNAH has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

18.    Defendant Rolls-Royce Commercial Marine, Inc. ("RRCM") is a Delaware corporation with its principal place of business in Chantilly, Virginia, and a registered agent for service of process in Florida. RRCM has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State. RRCM has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

19.    Defendant Converteam SAS ("Converteam") f/k/a Alstom Power Conversion SA, is a French business entity with its principal place of business in Belfort, France. Converteam has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the

7

attendance at trade shows specifically created for the development of cruise business in Florida. Converteam held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout this State. Converteam has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

20.     Defendant Converteam Inc., f/k/a Alstom Power Conversion Inc., is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Converteam Inc. has conducted and now conducts business in the State of Florida through its Merchant Marine Service office located in Miami and maintains a registered agent in Florida.     Converteam Inc. has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. Converteam Inc. held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida. Converteam Inc. marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout this State. Converteam Inc. has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

21.     Each of the named Defendants has subjected itself to jurisdiction in this Court by virtue of engaging in substantial and not isolated activities within this District; operating, conducting, engaging in, and/or carrying on a business or business venture in this District; having an office or agency in this District; committing a tortious act within this District; and/or by breaching warranties in this state by failing to perform acts required by warranties to be performed in this District. The Defendants' tortious and other actionable conduct described herein was specifically directed to, performed in, relied upon, and caused significant damage to Carnival in the Southern District of Florida.

22.     At all material times, the foreign Rolls-Royce and Converteam Defendants acted through their United States subsidiaries, which exist merely as a conduit for the purpose of doing the business of the foreign entities and have acted as the agents of the foreign entities in dealings with Carnival.

23.     The Rolls-Royce Defendants are merely alter egos of one another. At all material times, all Rolls-Royce Defendants acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, and sharing common ownership and directorships. Accordingly, the corporate distinctions between the Rolls-Royce Defendants should be disregarded by the Court, and the Rolls-Royce Defendants should be considered as one legal entity.

24.     The Converteam Defendants are merely alter egos of one another. At all material times, all Converteam Defendants acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, and sharing common ownership and directorships. Accordingly, the corporate distinctions between the

9

Converteam Defendants should be disregarded by the Court, and the Converteam Defendants should be considered as one legal entity.

### The Mermaid Consortium

25.    Prior to 1997, Kamewa (now Rolls-Royce AB) and Alstom Power Conversion, SA (now Converteam SAS) entered into a joint venture for the design, development, manufacture, sales, marketing, service and repair of an innovative podded propulsion system for seagoing vessels which it marketed and sold under the brand name "Mermaid." They claim to have been cooperating in a pre-study on pod propulsion systems as early as 1992. The joint venture was referred to by its participants as the Mermaid Consortium.

26.    The cruise ship industry is a major consumer of pod propulsion systems. Accordingly, the Mermaid Consortium developed a marketing strategy and engaged in business activity intended to induce the Florida based cruise industry, including Carnival, to invest in, purchase, use and/or maintain the Mermaid pod system in cruise vessels. The Mermaid Consortium has at all material times continuously engaged in a course of conduct within this District intended to convince the decision making executives acting for the Florida based cruise industry, including Carnival, to utilize the Mermaid pod system on cruise vessels constructed in various shipyards around the world.

27.    Rolls-Royce and Converteam analyzed the cruise ship industry, its operation, and its needs. Plans to introduce an optimized pod propulsion system suitable for speeds up to about 30 knots were allegedly developed sometime in 1994. However, the first Mermaid was not actually constructed until August 1999. It is now apparent that, in their

10

ill-planned collective effort to bring the Mermaid to market on an expedited basis, Rolls-Royce and Converteam failed to undertake the necessary research, development and testing to ensure the proper functioning of the Mermaid.

28.      The Mermaid Consortium has been assisted at all material times in its joint venture efforts by the Defendants, RRPLC, RRNAH, RRCM and Converteam Inc.  The Mermaid Consortium joint venturers and these Defendants have acted in concert to induce the sale and continued utilization of the Mermaid pod system by Florida based cruise businesses, including Carnival, and to continue the sale of parts and service to the exclusion of other suppliers, at inflated costs and on unconscionable terms.

**Cunard and the Queen Mary 2: A Tradition of Excellence**

29.      Carnival operates numerous cruise ship brands, including the prestigious Cunard Line.   Cunard has built its business reputation on an unwavering commitment to delivering its passengers the highest quality service and best oceanic travel experience possible.  Repeat passengers constitute a significant portion of Cunard's business.

30.      In order to fulfill this commitment to its passengers, Carnival has invested heavily in its fleet of modern, state of the art Cunard ocean liners featuring the highest quality technology available.  Prior to June 1998, Carnival decided to build the world's largest luxury ocean liner to enhance its Cunard fleet.  On March 10, 2000, Carnival signed a letter of intent for the construction of the QM2 at Chantiers de l'Atlantique, a French shipyard and non-party to this Complaint.  The formal contract for the construction of the QM2 was signed on November 6, 2000.

31.     The quality of the performance of Cunard's new flagship vessel was a critical consideration. The QM2 was to be 1,132 feet in length with a beam of 135 feet, featuring thirteen decks capable of providing unparalleled luxury services to 3,056 passengers. Additionally, with an anticipated cost of over $800 million, Carnival wanted the QM2 to not only offer the best aspects of cruising, but to do so using the most advanced technological features in order to deliver the highest level of performance available in the cruise ship industry.

32.     A cruise ship's performance is inextricably tied to the quality of its propulsion system. Accordingly, Carnival desired to employ the most technologically advanced, highest quality, most efficient propulsion system available for its flagship QM2. Thus, Carnival decided to employ a pod propulsion system.

33.     The shipbuilding contract for the QM2 specified that podded propulsion would be utilized, but the manufacturer of the pods for the vessel was not determined. Carnival was provided with a makers list identifying three potential manufacturers, one of whom was the Mermaid Consortium. Carnival ultimately approved Mermaid as the supplier for the pods in April of 2001.

**Rolls-Royce and Converteam conceal the truth and deceive Carnival**

34.     By the late 1990's, Carnival's plans to build the QM2 were well known within the cruise ship industry. In early 2000, Carnival met with several European shipyards to discuss the project. One of these shipyards was Chantiers de l'Atlantique ("CAT"), a subsidiary of Alstom. These meetings focused on the general design developed by

Carnival, and Carnival stated its intention to fit the QM2 with a podded propulsion system.

35.     Mermaid was, at the time, not well known to Carnival. Carnival had never used Mermaid propulsion units on any of its vessels. But Carnival had prior experience with the rival ABB Azipod system.

36.     From the time Rolls-Royce and Converteam became aware of the QM2 project, they engaged in an extensive marketing program intended to convince Carnival to employ the Mermaid propulsion system on the QM2 rather than the ABB Azipods. Representatives of the Mermaid Consortium, either directly or through their agents, made numerous false representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency and operational benefits of the Mermaid propulsion system to Carnival. These representations were made during presentations in Miami and other locations, as well as over the telephone and through the mail directed at Carnival executives in Miami, Florida. Rolls-Royce and Converteam knew that these false and misleading representations would be, and were in fact, critical inducements to Carnival in choosing Mermaid over the rival Azipod. Based upon these false and misleading representations, Carnival considered the Mermaid pods to be a fully developed product and approved Mermaid as the manufacturer for the QM2's podded propulsion units.

37.     Rolls-Royce and Converteam also emphasized the long history of their respective companies in producing superior electrical and mechanical equipment for ship propulsion applications as part of their effort to convince Carnival to choose the Mermaid over the

Azipod.  The numerous failures of the Mermaids, and Rolls-Royce and Converteam's complete inability to repair the Mermaids so that they can perform as warranted, speak to the lack of veracity of this representation.

38.　　The Defendants also accentuated the claimed superior performance capabilities of the Mermaid, representing that it could be operated without restrictions, thus maximizing the performance of the cruise ships.  This too proved to be false.  In fact, the numerous problems with the Mermaid pods caused Carnival to develop and institute limitations upon the operation of the Mermaid in an effort to reduce the operational stresses and reduce the number of failures.

39.　　In specific reliance on the false and misleading material representations made by Rolls-Royce and Converteam, either directly or through their agents, Carnival approved the selection of four 21.5 MW Mermaid pods for installation on the QM2.  But for the false and misleading material representations made by Rolls-Royce and Converteam, Carnival would not have purchased the Mermaid propulsion system.  Because of the numerous material misrepresentations and deceitful acts and practices of Rolls-Royce and Converteam, it was impossible for Carnival to evaluate adequately the advisability of purchasing the Mermaid.

40.　　Shortly after Mermaid was approved as the pod supplier, the Mermaid pods installed on other cruise ships began to experience serious and recurrent failures.  By July 2003, Carnival was aware of a total of 22 separate Mermaid pod failures on 7 different cruise ships.

41.     These numerous and catastrophic Mermaid failures caused significant concern at Carnival that the Mermaid pods destined for the QM2 would not perform as represented by the Mermaid Consortium.  In fact, Carnival was so concerned that they explored numerous possibilities for changing the QM2 design to utilize a propulsion system other than Mermaid.  Investigations were undertaken to analyze the potential for installing the ABB Azipod system, or even conventional shaft propulsion in place of the Mermaid pods.

42.     As problems continued occurring on other Mermaid equipped vessels and throughout the development, manufacture, testing and installation of the Mermaid pods for the QM2, Rolls-Royce and Converteam organized numerous meetings and presentations designed to appease Carnival's concerns and to induce Carnival to install the Mermaid units rather than switch to a different propulsion system.  Rolls-Royce and Converteam went to great lengths, including, but not limited to, multiple briefings and presentations, faxes, email correspondence and telephone calls to Carnival to quell the growing concerns that the Mermaid propulsion units were not a viable propulsion system and to assure Carnival that the Mermaid pods would be fully supported, monitored, and repaired.  Rolls-Royce and Converteam also made numerous representations as to why the Mermaid pods for the QM2 would not suffer from the same problems plaguing the Mermaid pods on other cruise ships.  Rolls-Royce and Converteam represented to Carnival that the Mermaid pods designed for the QM2 were the "New Generation" of Mermaid Pods.

43.   Although many meetings were held at which Rolls-Royce and Converteam made representations about the quality of the Mermaid pods for the QM2, two meetings were of particular importance and were directed specifically at Carnival's upper management to induce them to accept delivery of the QM2 with the Mermaid pods despite the myriad of problems experienced on other cruise ships.   One was held on November 3, 2003 at Alstom's headquarters in Paris.   The other was held just before delivery in mid-December 2003 in London.   At these meetings Rolls-Royce and Converteam explained why all of the identified problems with the Mermaid pods on other cruise ships would not occur on the QM2, either due to a solution to the problem being found or because of a difference in the design of the QM2 pods.   These representations were made to Carnival personnel by George Lowe, Duncan Forbes, Mats Johannsen, Stig Lonngren and Jean-Philippe Nicod, among others, and included, but are not limited to:

a.   that the QM2 Mermaid pods were specifically designed for the QM2 and were based upon specific hydrodynamic model testing, studies and stress analysis particular to the QM2 ship design;

b.   that because the Mermaid pods on the QM2 were unique and specifically designed for the QM2, they would not suffer from the same problems occurring with the Mermaid pods on other cruise ships;

c.   that the QM2 Mermaid pods use improved lubrication utilizing higher viscosity oil, security filters, cross-flow lubrication, and improved piping;

d.   that the QM2 Mermaid pod bearings would be coated with "no wear" coating using a patented metal mixed with diamond like carbon;

16

e.  that the QM2 pods would contain an improved bearing locking arrangement and increased spring force in pod bearing arrangement;

f.  that the QM2 pods would contain increased radial clearance in the bearings;

g.  that the QM2 pods would contain increased cooling capacity;

h.  that the QM2 pods would feature optimized relocation of vibration sensors.

44.     Additionally, Rolls-Royce and Converteam represented in July 2003 that the bearing lifetimes in the QM2 Mermaid pods would be 139,000 running hours for the radial bearing and 179,000 running hours for the thrust bearings.  This bearing life calculation equates to a minimum of 15 – 20 years.  This representation is grossly inaccurate.  Experience has proven that the Mermaid pod bearings must be changed at a minimum every 3 years.  In fact, failure of one of the QM2's thrust bearings was discovered after less than one year in operation.  Through their experience with Mermaid pods installed on other cruise ships, Rolls-Royce and Converteam knew that that bearing life was significantly less than what they represented to Carnival.

45.     The representations that extensive research, testing, and development had been performed on the Mermaid to specifically tailor the units to the QM2 significantly impacted Carnival's decision to use the Mermaid as opposed to using the Azipod.  However, the Mermaid, and specifically the Mermaid design for the QM2, was in fact merely an unproven, experimental propulsion concept at the time these representations were made to Carnival.

46.     Representatives of Rolls-Royce and Converteam, in meetings in Florida, as well as other locations, also falsely claimed that the Mermaid's component designs had been

17

adequately adjusted to compensate for the increased stresses and loads that would be encountered by the QM2's North Atlantic operations.  This has been proven untrue by the repeated problems experienced by the defective Mermaid pods installed on the QM2.

47.        In December 2003, and in specific reliance on the false and misleading material representations made by Rolls-Royce and Converteam, either directly or through their agents, Carnival accepted delivery of the QM2 with the Mermaid propulsion system.  But for the false and misleading material representations made by Rolls-Royce and Converteam, Carnival would not have believed that the Mermaid propulsion system was fit for its intended purpose, and Carnival would have rejected delivery of the QM2 as unsuited for the service for which it was ordered.  And, at the time that they made the false and misleading representations, Rolls-Royce and Converteam knew that these false and misleading representations would be, and were in fact, critical inducements to Carnival's decision to accept delivery of the QM2.

## Mermaid Pods on the QM2 Fail to Perform

48.        The QM2 has experienced numerous Mermaid problems over the past six years, dating back to the manufacture and installation of the Mermaid pods.  Throughout the manufacture of the Mermaid pods for the QM2, major problems were experienced with quality control at every step of the way, including at the SKF facility where the bearings were manufactured, at Rolls-Royce AB's facility in Kristinehamn, Sweden, and at Converteam's facility in Nancy, France where the pods were assembled.  This lack of quality control was most evident at Converteam's Nancy facility, where Carnival was

18

forced to place a full time employee simply to monitor the myriad quality control issues during the Mermaid assembly.

49.      In January 2003, during the Factory Acceptance Test for the QM2's Mermaid pods, an unusual excessive noise was detected in Pod #4 causing the tests to be immediately abandoned. After investigation, it was determined that Rolls-Royce and Converteam had failed to remove the packing tape from the pod roller bearings prior to assembly. This clear error resulted in the testing for pod #4 to be prematurely halted and caused damage within the pod. This glaring failure is but one example of the lack of acceptable quality control during the manufacture and installation of the Mermaid pods.

50.      Another example of negligence and lack of care during the manufacture of the pods was the discovery in November 2002 of an excessive amount of paint from the pod housing flaking and contaminating the lubrication system within the pods. During the pod assembly, it was also discovered that the assembly factory in Nancy, France was working from a different, outdated set of drawings than those used in designing the Mermaid pods in Kristinehamn, Sweden.

51.      As a result of the numerous quality control lapses, in the Spring of 2003 the Mermaid pods, which had already been assembled and delivered, were sent back to the Rolls-Royce and Converteam facilities, and/or their subcontractors' facilities, to be fully stripped, cleaned and reassembled under strict cleanliness and quality controls. This caused the pods to be delivered late to the shipyard, so much so that the QM2 was originally floated out of dry-dock without the Mermaid pods installed and later had to be brought back to the dry-dock to fit the Mermaid pods before sea trials.

52.     Due to the uncertainty about the Mermaid pods ability to perform as represented, based upon Mermaid failures on other cruise ships and the lack of confidence in quality control during the manufacturing process, Carnival was forced to fit the QM2 with numerous independent monitoring systems for the Mermaid pods.  These various monitoring systems are designed to detect any problems or irregularities with the Mermaid pods at an early stage to prevent catastrophic failure.  Carnival has expended, and will continue to expend, significant costs for monitoring equipment and for analysis of the monitoring data.  These costs are attributable solely to Rolls-Royce and Converteam's inability to provide a product that would perform as warranted.

53.     Leading up to the QM2's first dry-docking in November 2005, Rolls-Royce made numerous representations to Carnival regarding improvements to the materials and design of the Mermaid pods, and particularly the pod bearings.  They stated that along with SKF, the producer of the steel for the bearings, they had developed a new, stronger steel material that would prevent the cracking in the bearings that was causing many failures of other Mermaid pods.  Thus, at the urging of Rolls-Royce, Carnival replaced all bearings on the QM2's four Mermaid pods during the ship's dry-dock in November 2005, at significant cost to Carnival.  Despite the fact that Rolls-Royce had induced Carnival to accept delivery of the QM2 by representing that the bearings would have a life expectancy of 139,000 running hours for the radial bearing and 179,000 running hours for the thrust bearings, the QM2 bearings had only been in operation for less than two years (which equates to a maximum of 17,520 hours) when they were required to be replaced.

54.     Examination of the bearings removed during the 2005 dry-dock revealed spalling of the "No Wear" DLC coating on the bearing rollers and indications of electrical current arcing across the bearings.  Also, butterfly cracks were discovered in the inner and outer races of the bearings.   These conditions all reduce the bearing life, thus requiring more frequent replacement of the bearings than as represented by Rolls-Royce and Converteam prior to selection and delivery of the Mermaid pods.

55.     Rolls-Royce and Converteam represented that the new bearings and added insulation installed during the 2005 dry-dock would remedy all of these problems.  These representations proved to be false, as all of the problems continued and even progressed after the dry-dock repairs.

56.     In November 2006, the QM2 returned to dry-dock to repair one pod that was damaged due to grounding.  The repaired pod incorporated the latest bearing design and composition.  Leading up to this dry-dock, Rolls-Royce again strongly recommended that Carnival replace the thrust bearings on all of the other Mermaid pods with new bearings composed of an even more advanced material and design.  And again, based upon the representations made by Rolls-Royce during meetings, presentations, and in other communications, Carnival decided to replace the Mermaid thrust bearings on the Mermaid pods, after only one year in operation.  Carnival was again forced to incur significant costs to replace the bearings, for both excessive labor and materials costs.

57.     Examination of the bearings removed during the 2006 dry-docking revealed that the thrust bearing in Mermaid pod number 4 had failed and would have caused a complete pod failure within a relatively short period of time if it had continued in

21

operation after the dry-dock. The raceway of the bearing was completely cracked with large pieces of metal missing. This bearing had been in service for only one year. Additionally, butterfly cracking, spalling of the "No Wear" DLC coating, and damage from electrical discharge across the bearings were again observed. It was clearly apparent that the repairs undertaken during the 2005 dry-docking had not fixed any of the problems with the Mermaid pods, contrary to the representations of Rolls-Royce and Converteam.

58.     Rolls-Royce and Converteam once again claimed to have fixed the bearing problems with the new bearing material and design, and the electrical arcing problem with increased insulation and improved earthing arrangements. They represented to Carnival that the problems would not occur again. These representations again proved to be false, as the electrical and bearing problems continue to this day.

59.     Additionally, during the 2006 dry-docking it was discovered that cracks were beginning to form in the exciter frames where they connect to the pod housing. These cracks continued to worsen during operation of the QM2 after the 2006 dry-dock. Converteam acknowledged that there is a problem with cracking in the exciter frame, but refused to recognize that the problem is due to a deficient design and refused to redesign a new exciter frame suitable to withstand the stresses found within the Mermaid pods. The exciter frame is the original design installed in the QM2 Mermaid pods.

60.     Additional supports were welded to the cracked exciter frames during various port calls as a temporary fix to the problem. These temporary welds repeatedly failed due to extremely difficult working conditions within the pods, which prevented proper welding

22

procedures. But more stiffeners were continually added to the exciter frames, and these additional supports did prevent the exciter frames from completely breaking loose inside of the pods, which would have resulted in a catastrophic failure of the Mermaid pods. A permanent solution to the exciter frame problems has been proposed for implementation at the next dry-dock, scheduled for October – November 2008. But the effectiveness of the proposed solution is yet to be determined, particularly in light of Rolls-Royce and Converteam's previous "solutions" which have failed to solve any of the Mermaid pod problems. These repairs constitute another significant cost that will be incurred by Carnival as a result of the faulty and defective Mermaid pods provided by Rolls-Royce and Converteam.

61.     Yet another major problem with the defective Mermaid pods developed during the operation of the QM2 after the 2006 dry-dock. This problem involved cracking and breaking of the damper bars due to a flaw in Converteam's original design. This problem was first noticed when a broken piece of a damper bar was found lying on the bottom of the pod during an inspection. After this discovery, the damper bars have been inspected at nearly every port of call. Numerous other failures of damper bars have been discovered on a regular basis. Several temporary repairs have been conducted in an attempt to fix the problem, but Converteam has yet to definitively identify the cause of the cracking. Several proposed repairs will be undertaken at the October – November 2008 dry-dock, again with uncertainty as to the effectiveness and durability of the repairs. Carnival will incur substantial costs to effect these repairs to the damper bars at dry-dock.

62.     Currently, numerous problems continue to plague the Mermaid pods on the QM2. The expected bearing life is drastically shorter than what was represented to Carnival by Rolls-Royce and Converteam to induce Carnival to accept delivery of the ship.  As a result, Carnival is forced to dry-dock the vessel every two or three years to replace the bearings rather than implement a standard five-year dry-dock schedule.  Each additional dry-dock requires Carnival to expend substantial amounts for parts, labor, and other costs that would otherwise not be necessary if the Mermaid pods functioned as warranted. Each additional dry-dock also results in the loss of revenue generating cruises and other consequential losses.

63.     The QM2 also continues to experience problems due to electrical discharge across the bearings, and the exciter frames and damper bars continue to suffer from unwanted cracking.  Also, spalling of the slewing bearing has recently been discovered in at least one of the Mermaid pods.

64.     It has become evident based upon these numerous defects and failures that the Mermaid pods installed on the QM2 are defective products that are not fit for their intended purpose.  The representations that the Mermaid propulsion system was a reliable propulsion system and was fit for use on a transatlantic ocean liner were entirely false. Despite having been reassured, again and again, that the problems with the Mermaid pods had been identified and solved, the same problems and new problems continue to arise.

65.     Since these problems have first appeared, Rolls-Royce and Converteam have engaged in an ongoing conspiracy to cover up and prevent Carnival from discovering the fact that the Mermaids suffer from numerous design and manufacturing defects so that

Carnival would accept delivery of the QM2. Upon information and belief, Rolls-Royce and Converteam deceived, and conspired to deceive, Carnival into believing that the problems encountered with the Mermaids on the QM2 were resolved, even though Rolls-Royce and Converteam knew that, since such problems were not actually resolved, it was substantially certain that the pods would continue to experience failures.

66. Upon information and belief, Rolls-Royce and Converteam knew that each time they pretended to fix a failed pod, it would in fact break again, because Rolls-Royce and Converteam in reality had no solution whatsoever for the complex design and manufacturing defects plaguing the Mermaids installed on the QM2, nor did they want to incur the cost of undertaking a complete redesign.

67. Upon information and belief, Rolls-Royce and Converteam knowingly decided to deceive Carnival into believing that the Mermaids could be made to function properly instead of admitting to Carnival that the Mermaids suffered from numerous complex design and manufacturing defects that the Defendants could not or would not solve.

68. As a direct and proximate result of Rolls-Royce and Converteam's fraudulent and deceitful conspiratorial acts, together with their multiple breaches of implied warranties and violations of Florida Statutes, Carnival has suffered, and will continue to suffer, millions of dollars in damages due to costs of repairs, maintenance, monitoring systems and analysis. Also, the QM2 will be forced to undertake dry-dockings every three years throughout the life of the ship to replace the Mermaid pod components rather than the standard five year dry-dock schedule that would have been employed if the Mermaid pods functioned as warranted. Carnival will suffer millions of dollars of damages

25

resulting from these additional dry-dockings, as well as other consequential and incidental damages. Additionally, the defective Mermaid pods may have to be replaced with properly functioning units. Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

69.    In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs directly attributable to the wrongful conduct of each of the named Defendants. Plaintiffs are entitled to recover their attorneys' fees and costs from each of the Defendants, pursuant to Florida. Statute sections 501.211, 501.2105, and 817.41(6).

<u>**Count I**</u>

**Breach of Implied Warranty of Fitness for Particular Purpose against Rolls-Royce, Converteam, and the Mermaid Consortium**

70.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

71.    Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid pod propulsion system within the meaning of section 672.315 of the Florida Statutes.

72.    Rolls-Royce and Converteam have had numerous direct contacts with Carnival in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls-Royce and Converteam informed Carnival that the Mermaid was a proven, reliable, state-of-the-art propulsion system with a design, technology and features that were superior to the other pod system on the market and conventional propulsion systems used on cruise ships, and which was especially suited for the particular operational needs of Carnival

and the QM2, including but not limited to extending the time between dry-dockings and reducing the length and maintenance work necessary during dry-dockings.

73.    At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, the Defendants had reason to know, and did know, of the particular purposes for which, and operational conditions in which, Carnival intended to operate the Mermaids on the QM2.  Specifically, Rolls-Royce and Converteam knew that the QM2 would be operated primarily as a transatlantic ocean liner and would be subject to the increased stresses and punishing conditions present in the North Atlantic.

74.    At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, these Defendants had reason to know that Carnival was relying in good faith upon Rolls-Royce and Converteam's skill and judgment to select or furnish a suitable propulsion system for the particular purposes and operational conditions in which Carnival intended to use the QM2.

75.    Carnival did in fact rely upon Rolls-Royce and Converteam's skill, judgment and representations regarding the Mermaids when deciding to select the Mermaids for installation on the QM2 and in deciding to accept delivery of the QM2 with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

76.    Rolls-Royce and Converteam's representations created an implied warranty that the Mermaids were fit for the particular operational needs of Carnival and the QM2 pursuant to section 672.315 of the Florida Statutes.

77.    Rolls-Royce and Converteam have breached their implied warranties to Carnival, in that the Mermaid pods installed on the QM2 were defective, unreliable, and unsuitable

27

for the particular purpose for which Carnival purchased them.    In particular, the Mermaids have a defective bearing design and numerous defective electrical components which render the units subject to constant and continuous maintenance problems and premature repair and replacement of various component parts, resulting in more frequent dry-dockings at significant costs to Carnival and damages resulting from a reduction in the number of revenue generating cruises the QM2 can sail.    In fact, the Mermaids delivered by Rolls-Royce and Converteam to Carnival are unsuitable for use on a transatlantic ocean liner because of significant design and manufacturing defects that neither Rolls-Royce nor Converteam have been able to repair.    As a result, the Mermaid is subject to constant and continuous problems requiring additional, extended, and expensive dry docks.    In addition, it is apparent from the problems experienced with the Mermaid pods that Mermaid propulsion technology is not a proven technology, and cannot be made to perform as warranted.

78.      As a direct and proximate result of Rolls-Royce and Converteam's breaches of the implied warranty of fitness for a particular purpose, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.    Accordingly, Carnival has suffered substantial damages, including but not limited to, repair costs, pod monitoring and analysis costs, and consequential and incidental damages.    Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.    Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count II

### Breach of Implied Warranty of Merchantability against Rolls-Royce, Converteam, and the Mermaid Consortium

79.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

80.     Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid and are "merchants" of Mermaids within the meaning of section 672.314 of the Florida Statutes.

81.     Rolls-Royce and Converteam have had numerous contacts with Carnival in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls-Royce and Converteam informed Carnival that the Mermaid was a proven, reliable, state-of-the-art propulsion system fit for the ordinary purpose of propelling cruise ships.

82.     Pursuant to section 672.314 of the Florida Statutes, Rolls-Royce and Converteam's numerous and direct affirmations to Carnival about the Mermaid propulsion system created implied warranties of merchantability in Carnival's agreement to install Mermaids on the QM2 and in deciding to accept delivery of the QM2 with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

83.     Rolls-Royce and Converteam breached their implied warranties of merchantability because the Mermaid is not fit for the ordinary purpose of propelling a cruise ship. In fact, the Mermaids delivered by Rolls-Royce and Converteam to Carnival are entirely unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls-Royce nor Converteam have been able to repair. As a result,

the Mermaid is subject to constant and continuous problems requiring additional, extended and expensive dry docks.  In addition, it is clear that Mermaid propulsion technology is not yet proven technology, and Rolls-Royce and Converteam have been unable to make the Mermaid fit for the ordinary purpose of propelling a cruise ship.

84.     As a result of Rolls-Royce and Converteam's breaches of warranty, Carnival has paid millions of dollars for defective pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  As a direct and proximate result of Rolls-Royce and Converteam's breaches of warranty, Carnival has in fact suffered substantial damages, including but not limited to, repair costs, monitoring costs, and consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count III

### Negligent Misrepresentation against Rolls-Royce, Converteam, and the Mermaid Consortium

85.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

86.     In the course of their business, Rolls-Royce and Converteam, either directly or through their agents, made numerous representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking requirements and operational benefits of the Mermaid propulsion system to Carnival, including but not limited to:

30

a. that extensive research, testing, and development had been performed upon the Mermaids specifically for the QM2;

b. that the problems experienced with Mermaid pods on other cruise ships would not occur on the QM2 due to advanced design and materials;

c. that the Mermaid employed more advanced technology than the rival Azipod unit, specifically by utilizing a SKF bearing with a CARB design and a "no wear" coating, an enhanced cooling system, improved silver/silver slip rings, the ability to lock the shaft in position with a shaft brake, and numerous other advantages;

d. that the Mermaids would increase propulsion system efficiency and reduce total fuel consumption;

e. that the Mermaids would provide increased propulsion system reliability and reduced maintenance and repair costs;

f. that the Mermaids would produce reduced noise and vibration levels;

g. that the Mermaids would provide improved maneuverability and stopping capability;

h. that the Mermaids were capable of underwater mounting/dismounting of the complete Mermaid unit without the need to dry dock the vessel;

i. that the Mermaid shaft seals were of the same design as seals which had been used throughout the maritime industry for years, and were thus more reliable than those used on the rival Azipod unit;

j.  that the mechanical components (including bearings, seals, couplings, etc.) employed in the Mermaid had a long history of use in the shipbuilding industry, and were thus more reliable than those used on the rival Azipod unit;

k.  that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by operation in the harsh conditions of the North Atlantic;

l.  that the seals and bearings employed in the Mermaid constituted a superior technical solution to those employed in the rival Azipod unit;

m. that the bearings would have a life of 139,000 running hours for the radial bearings and 179,000 running hours for the thrust bearings;

n.  that the Mermaid could be operated without any restrictions that would negatively impact the ship's performance at sea;

o.  that the Mermaid did not suffer from design and manufacturing defects that Rolls-Royce and Converteam were unable to remedy, but that the Mermaid could be effectively repaired to perform as represented by its manufacturers, the Defendants herein; and that Rolls-Royce and Converteam would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

87.     These statements made by Rolls-Royce and Converteam to Carnival concerned material facts.

88.     These statements made by Rolls-Royce and Converteam to Carnival were false when made.

89.     In the exercise of reasonable care under the circumstances, Rolls-Royce and Converteam should have known that these statements were false at the time they were made.

90.     At the time Rolls-Royce and Converteam made these misrepresentations, they intended and/or expected that Carnival would rely upon these false representations in ordering the Mermaid pods for installation on the QM2.

91.     Carnival reasonably and justifiably relied on these misrepresentations to its detriment. But for the misrepresentations by Rolls-Royce and Converteam, Carnival would not have placed the Mermaid pods on the QM2.

92.      As a direct and proximate result of the negligent misrepresentations of Rolls-Royce and Converteam, Carnival has been damaged in that it paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Carnival has suffered substantial damages as a result of the negligent misrepresentations of Rolls-Royce and Converteam, including but not limited to, repair costs, maintenance costs, consequential and incidental damages. Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count IV

### Fraud in the Inducement by Rolls-Royce, Converteam, and the Mermaid Consortium

93.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

94.     In order to induce Carnival to select the Mermaid propulsion system for installation on the QM2 and to induce Carnival to accept delivery of the QM2 with the Mermaid propulsion system after numerous and significant failures of the Mermaid systems on other cruise ships, Rolls-Royce and Converteam made numerous representations of material facts regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking requirements, and operational benefits of the Mermaid to Carnival, including but not limited to those identified in paragraph 86 of this Complaint.

95.     Rolls-Royce and Converteam knew or should have known that these representations of material fact were false at the time they were made, and/or made these representations without knowledge of their truth or falsity.

96.     Rolls-Royce and Converteam made these misrepresentations of material facts with the intent that Carnival rely on the misrepresentations and to induce Carnival to act on them by selecting the Mermaid propulsion system for installation on the QM2.

97.     Rolls-Royce and Converteam made these misrepresentations of material facts with the intent that Carnival rely on the misrepresentations and to induce Carnival to act on them by accepting delivery of the QM2 with the Mermaid propulsion systems despite the

34

numerous and significant problems experienced by other cruise ships equipped with the Mermaid pods.

98.     Carnival reasonably and justifiably relied on these misrepresentations of material fact to its detriment.  But for the misrepresentations of material fact by Rolls-Royce and Converteam, Carnival would not have placed the Mermaid propulsion system on the QM2.

99.     As a direct and proximate result of the fraudulent inducements of Rolls-Royce and Converteam, Carnival has been damaged, in that it finds itself with pod propulsion systems that do not function properly, and neither Rolls-Royce nor Converteam has been able to correct the deficiencies.  Carnival has suffered substantial damages caused by the fraud of Rolls-Royce and Converteam, including but not limited to, repair costs, monitoring costs, consequential and incidental damages.   Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count V

### Fraudulent Misrepresentation by Rolls-Royce, Converteam, and the Mermaid Consortium

100.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

101.    From 2000 to the present, Rolls-Royce and Converteam have made numerous representations of material fact to Carnival, including but not limited to those identified in paragraph 86 of this Complaint.

102.     Rolls-Royce and Converteam knew these representations of material fact were false at the time they were made, and/or made these representations knowing that they were without knowledge of the statements' truth or falsity.

103.     Rolls-Royce and Converteam made these representations with the intent that Carnival would rely on the false statements.

104.     Carnival reasonably and justifiably relied on the misrepresentations to its detriment.

105.     As a direct and proximate result of the fraud of Rolls-Royce and Converteam, Carnival has spent millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Carnival has suffered substantial damages caused by the fraud of Rolls-Royce and Converteam, including but not limited to, repair costs, monitoring costs, consequential and incidental damages. Additionally, the defective Mermaid pods may have to be replaced with properly functioning units. Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

### Count VI

### Deceptive and Unfair Trade Practices against Rolls-Royce, Converteam, and the Mermaid Consortium

106.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

107.     Carnival is a "consumer" as defined by section 501.203(7) of the Florida Statutes.

108.     Rolls-Royce and Converteam's actions in soliciting, marketing, promoting, advertising, offering, providing, selling and distributing the Mermaid propulsion system

to Carnival in Florida constitute "trade or commerce" under section 501.203 of the Florida Statutes.

109.    Rolls-Royce and Converteam's numerous misrepresentations to Carnival regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking requirements and operational benefits of the Mermaid constituted unconscionable, unfair and deceptive acts or practices in the conduct of trade or commerce in violation of section 501.204 of the Florida Statutes.

110.    As a result of Rolls-Royce and Converteam's unlawful practices in violation of section 501.204 of the Florida Statutes, Carnival has incurred substantial actual damages.

111.    As a direct and proximate result of Rolls-Royce and Converteam's unlawful practices in violation of section 501.204, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.    Accordingly, Carnival is entitled to actual damages. Additionally, under sections 501.211 and 501.2105 of the Florida Statutes, Carnival is entitled to recover from Rolls-Royce and Converteam reasonable attorneys' fees and costs incurred in this action.

### Count VII

**Negligent Testing, Inspecting, Repairing, and/or Servicing against Rolls-Royce, Converteam, and the Mermaid Consortium**

112.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

113.    Prior to and after delivery of the QM2, Rolls-Royce and Converteam directly, and through their subsidiaries in Florida acting as their agents, had duties to test, inspect,

37

repair and service the Mermaid pods in numerous instances, including, among others, as set forth hereinabove.

114.    Rolls-Royce and Converteam breached their duties to Carnival by failing to properly test, inspect, repair and service the Mermaid pods in the numerous instances as set forth above.

115.    As a direct and proximate cause of Rolls-Royce and Converteam's negligent testing, inspecting, repairing and/or servicing, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Carnival has suffered substantial damages caused by the negligence of Rolls-Royce and Converteam, including but not limited to, repair costs, monitoring costs, consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

### Count VIII

**Breach of Warranty of Workmanlike Performance against Rolls-Royce, Converteam, and the Mermaid Consortium**

116.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

117.    As a separate cause of action under the general maritime law, Carnival avers that Rolls-Royce and Converteam, directly and through their subsidiaries in Florida, which acted as their agents, breached their warranties of workmanlike performance for failure to perform inspections and repairs of the Mermaids aboard the QM2 in a workmanlike manner.

38

118.     Prior to and after delivery of the QM2, Rolls-Royce and Converteam held themselves out as competent and able to inspect, diagnose and repair problems with operation and performance of the Mermaids, but have repeatedly failed to do so in numerous instances, including, among others, as set forth hereinabove.

119.     As a direct and proximate result of Rolls-Royce and Converteam's breach of the warranty of workmanlike performance, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  As a direct and proximate result of Defendants' breach of the warranty of workmanlike performance, Carnival has suffered substantial damages, including but not limited to, repair costs, monitoring costs, consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count IX

**Negligent Professional Services against Rolls-Royce, Converteam, and the Mermaid Consortium**

120.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

121.     In the course of their business, Rolls-Royce and Converteam supply cruise ship operators, such as Carnival, with their professional advice and services regarding the operation and maintenance of the Mermaid and the dry docking requirements of the Mermaid.  Rolls-Royce and Converteam provide their professional skills and services for

39

the design, construction, servicing, maintaining, testing and repairing of the Mermaids on these cruise ships.

122.     Rolls-Royce and Converteam have had, at all material times, a duty of reasonable care to Carnival to provide professional services in accordance with the standard of care used by similar professionals in the community under similar circumstances, concerning the reliability and operational efficiency of the Mermaid, which include, but are not limited to, designing, constructing, servicing, maintaining, testing and repairing of the Mermaids on the QM2.

123.     Rolls-Royce and Converteam employ and/or retain engineers, architects and other professionals in the field of naval engineering and architecture, and hold themselves out as competent and able to design, construct, test, inspect, diagnose and repair problems with operation and performance of the Mermaids, but have failed to do so in numerous instances, including, among others, as set forth above.

124.     Prior to and after the delivery of the QM2, Rolls-Royce and Converteam, directly and through their subsidiaries in Florida acting as their agents, designed, constructed, serviced, maintained, tested and repaired for Carnival the Mermaids on the QM2.   The design, construction, servicing, maintenance, tests and repairs of the Mermaids on the QM2 were performed by and through Rolls-Royce and Converteam's employees, agents and representatives.

125.     These Defendants, through their employees, agents and representatives, breached their duty to Carnival by failing to provide reasonable professional services in the design, construction, testing, inspection, diagnosis and repairing problems with the operation and

performance of the Mermaids.  The Mermaids have failed to perform their intended purpose as they were improperly designed, constructed, serviced, maintained, tested and repaired.

126.     As a direct and proximate result of Rolls-Royce and Converteam's negligent professional services, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Carnival has suffered substantial damages, including but not limited to, repair costs, monitoring costs, incidental and consequential damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units. Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count X

### False, Misleading and Deceptive Advertising and Sales by Rolls-Royce, Converteam, and the Mermaid Consortium

127.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

128.     Rolls-Royce and Converteam's actions in advertising, marketing, promoting, providing, distributing, and selling the Mermaid to Carnival constitute "misleading advertising" under section 817.40(5) of the Florida Statutes.

129.     For several years, until Rolls-Royce and Converteam finally induced Carnival to select the Mermaid for the QM2, Rolls-Royce and Converteam in their advertising, marketing, promoting, and selling the Mermaid, made numerous false representations of

material fact in Florida regarding the quality, reliability and cost-efficiency of the Mermaid.

130.     Rolls-Royce and Converteam knew or should have known that these representations were false at the time they made them.

131.     Carnival reasonably and justifiably relied on the misrepresentations to its detriment.  But for Rolls-Royce and Converteam's misrepresentations, Carnival would not have selected the Mermaid for installation on the QM2.

132.     As a direct and proximate result of Rolls-Royce and Converteam's unlawful practices in violation of section 817.41(1) of the Florida Statutes, Carnival has incurred substantial damages.

133.     As a direct and proximate result of Rolls-Royce and Converteam's false, misleading and deceptive advertising and sales, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Pursuant to section 817.41(6) of the Florida Statutes, Carnival is entitled to recover reasonable attorneys' fees, costs, and actual damages.

## Count XI

### Civil Conspiracy against Rolls-Royce and Converteam

134.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

135.     Rolls-Royce and Converteam entered into an agreement to defraud and deceive the passenger cruise industry, and specifically Carnival, as to the design, development,

testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid.

136.    Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive Carnival regarding their ability to make the defective Mermaid function as represented.

137.    Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive Carnival by refusing to disclose to Carnival the true nature of the design and manufacturing defects from which the Mermaid suffered, which information was known to Rolls-Royce and Converteam.

138.    Rolls-Royce and Converteam engaged in tortious acts in furtherance of the above agreements.

139.    Rolls-Royce and Converteam conducted overt acts in furtherance of the tortious agreements into which they entered by actively defrauding and deceiving Carnival on numerous instances as set forth in the general allegations and counts above.

140.    The overt acts taken by Rolls-Royce and Converteam in the furtherance of the tortious conspiracies described herein were the direct and proximate cause of substantial damages to Carnival, including but not limited to, repair costs, monitoring costs, consequential and incidental damages.

## DEMAND FOR JURY TRIAL

141.    Plaintiffs hereby demand a trial by jury in this action.

**WHEREFORE,** Plaintiffs seek:

142.   A finding of liability as to each of the Defendants for the causes of action alleged in this Complaint;

143.   An Order from this Court directing the Defendants to replace the defective Mermaids with pods that function properly, or to pay the cost of doing so;

144.   An award of actual and consequential damages;

145.   An award of damages to compensate Plaintiffs for loss of past and future profits;

146.   An award of attorneys' fees and costs pursuant to Florida Statute sections 501.211, 501.2105, and 817.41(6); and

147.   Pre and post-judgment interest.

Dated:   *12 - 1 - 08*

Respectfully submitted,

**FOWLER RODRIGUEZ VALDES-FAULI**

By:
Maria Isabel Hoelle
*Florida Bar No. 0381871*
355 Alhambra Circle, Suite #801
Coral Gables, Florida 33134
Tel.: (786) 364-8400
Fax: (786) 364-8401
*MHoelle@frvf-law.com*
*ATTORNEYS FOR PLAINTIFFS*

44

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

FILED by ___TS___ D.C.

DEC. 1, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

CARNIVAL CORPORATION, CARNIVAL PLC and
CUNARD LINE, LTD.

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Maria Isabel Hoelle, Esquire        786-364-8400
Fowler Rodriguez Valdes-Fauli
355 Alhambra Circle, Suite 801
Coral Gables, FL 33134

## DEFENDANTS

ROLLS-ROYCE PLC, ROLLS-ROYCE AB, ROLLS-ROYCE
NORTH AMERICAN HOLDINGS, INC.,et al

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☑ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☑ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Miami 08CV 23318 Seitz O'Sullivan

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R. R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☑ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO

JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 USC §1332

LENGTH OF TRIAL via 20 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ IN EXCESS OF $100million

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  12/1/08

FOR OFFICE USE ONLY

AMOUNT $350.  RECEIPT # 99104

12/01/08