UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-23318-CIV-SEITZ/O'SULLIVAN

CARNIVAL CORPORATION, CARNIVAL
PLC and CUNARD LINE, LTD.

       Plaintiffs,

v.

ROLLS-ROYCE PLC, ROLLS-ROYCE
AB,ROLLS-ROYCE NORTH AMERICAN
HOLDINGS, INC., ROLLS-ROYCE
COMMERICAL MARINE, INC.,
CONVERTEAM SAS f/k/a ALSTOM
POWER CONVERSION SA, CONVERTEAM,
INC. f/k/a ALSTOM POWER CONVERSION,
INC, ROLLS-ROYCE AB and CONVERTEAM
SAS, jointly and severally, d/b/a THE MERMAID
CONSORTIUM,

       Defendants.
_____ /

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiffs, Carnival Corporation, Carnival PLC and Cunard Line Ltd. (collectively referred to as "Carnival"), bring this Second Amended Complaint against Defendants, Rolls-Royce PLC, Rolls-Royce AB, Rolls-Royce North American Holdings, Inc. and Rolls-Royce Commercial Marine, Inc. (collectively referred to as "Rolls-Royce"), Converteam SAS f/k/a Alstom Power Conversion SA, Converteam Inc. f/k/a Alstom Power Conversion Inc. (collectively referred to as "Converteam" or "Alstom"), and Rolls-Royce AB and Converteam SAS f/k/a Alstom Power Conversion SA, jointly and severally, d/b/a The Mermaid Consortium, and state as follows:

**Nature of the Action**

1.     This is an action by Carnival for damages in excess of $130 million arising from the Defendants' marketing, sale, design, construction, servicing and repair of a vessel propulsion system for Carnival's ocean liner, the QUEEN MARY 2 ("QM2").

2.     The damages were suffered as a result of the Defendants having defrauded and deceived Carnival into the selection, acceptance and continued use of a defective propulsion system.  This propulsion system was marketed by the Defendants as the Mermaid pod propulsion system (hereinafter the "Mermaid").  It was touted by the Defendants as the best pod propulsion system in the industry and also as a proven, well-tested product.  These representations were false.  The Mermaid turned out to be a defectively designed and defectively manufactured product which was, contrary to Defendants' representations, in fact at an experimental stage of its development and seriously under-designed when it was put into operational use.

3.     From their inception, the Mermaids on numerous other cruise ships experienced serious problems causing repeated interruption and restriction of operations. The selection of Mermaids for use on the QM2 was made based on the direct assurances by the Defendants as to the quality of the product and shortly before repeated failures and other problems began occurring on other Mermaid equipped cruise ships.  Prior to the delivery of the vessel, the Mermaid's problems were well publicized and caused grave concern.

4.     In fact, several cruise ship operators have instituted legal actions that are currently proceeding in Florida courts against these same Defendants for similar failures of the Mermaids on their vessels.  Royal Caribbean Cruise Lines and Celebrity Cruises are litigating similar causes of action in the 11th Judicial Circuit in and for Miami-Dade County, case no. 03-18350.

2

Additionally, Regent Seven Seas Cruises has been pursuing a claim in this Court (Case no. 06-22347-PCH) for problems occurring with the Mermaid on one of its cruise ships, the SEVEN SEAS MARINER.

5.      Carnival was prepared to delay delivery of the QM2 because they were not convinced that the Mermaids were fit for their purpose as a propulsion system.   But the Defendants claimed, as each problem arose, that each was an isolated incident, that they had carefully studied the problem, and that they could resolve the problem so it would not occur again.  The Defendants also repeatedly represented to Carnival that the problems experienced on other vessels would not occur on the QM2 due to an advanced pod design and improved components used in the QM2's pods.

6.      Based upon these false representations and assurances from the Defendants, Carnival agreed to accept delivery of the QM2 with the Mermaids subject to assurances of extended guarantees and indemnity for any potential pod failures.  Although, Defendants were quick to assure, appease and provide these guarantees for the Mermaids to Carnival, at least in name, they failed to designate the applicable terms for the guarantees and had no intentions of ever honoring the "so called" guarantees when problems subsequently arose.

7.      Numerous problems with the Mermaids on the QM2 have been experienced and continue to date.  The Mermaids are simply defective and do not perform as represented by Defendants.  More importantly, it is also evident that the Defendants have known that the Mermaids are defective and that they have deliberately conspired to mislead, deceive and defraud Carnival into believing otherwise.  The Defendants have refused to expend the necessary financial investment in the redesign and/or replacement of the defective Mermaids.  As a result,

Carnival has sustained damages presently estimated to be in excess of $130 million (and growing) due to the costs of repairs, lost revenue and additional non-anticipated maintenance expenses. Carnival will continue to suffer damages in the future because the defective Mermaids have not been properly repaired or redesigned and continue to suffer numerous problems resulting in significant losses to Carnival.

8.     This lawsuit alleges causes of action pursuant to the laws of Florida and the general maritime law for: breach of implied warranty of merchantability; breach of implied warranty of fitness for a particular purpose; breach of warranty of workmanlike performance; fraud in the inducement; fraudulent misrepresentation; negligent misrepresentation; deceptive and unfair trade practices; negligent testing, inspecting, repairing, and/or servicing; negligent professional services; false, misleading and deceptive advertising and sales; and civil conspiracy.

**Jurisdiction, Venue and Parties**

9.     This is an action for damages in excess of seventy-five thousand United States dollars ($75,000.00) against all defendants exclusive of interests, costs and attorneys fees.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that all parties are diverse.

11.     The venue for this action is proper in this District as the wrongful and unlawful conduct of the Defendants and/or transactions giving rise to the causes of action occurred and/or had substantial effect within the Southern District of Florida and one or more of the Defendants:

a.     Does business within the Southern District of Florida; and/or

b.     Committed unlawful and tortious conduct within the Southern District of Florida and damaged Plaintiffs within the Southern District of Florida; and/or

4

c.      Actively solicited business in this District; and /or

d.      Was a resident in this District during the time of the transactions and tortious acts complained of; and/or

e.      Held itself out as a company licensed or registered to do business and doing business within this District.

12.     Plaintiff Carnival Corporation is a foreign corporation authorized to do business in Florida and with its principal place of business within the Southern District of Florida, in Miami, Florida.  Carnival is in the cruise ship industry and is the parent corporation of Cunard Line Ltd.

13.     Plaintiff Carnival PLC is a foreign corporation authorized to do business in Florida and currently conducting business in the Southern District of Florida.  Carnival PLC is the registered owner and operator of the QM2.

14.     Plaintiff Cunard Line Ltd. is a foreign corporation authorized to do business in Florida and until 21st December 2004 conducted business in the Southern District of Florida.  On 21st December 2004 all the business of Cunard was transferred to Carnival PLC.  Cunard maintained its principal place of business in Miami, Florida for much of the time period relevant to this claim.

15.     The QM2 is a luxury ocean liner built specifically for use in the passenger trade. Since 2004, Carnival's use of the QM2 includes the operation of voyages calling at Florida ports and carrying United States and Florida as well as non-Florida passengers and crew.  The destination of the QM2's maiden voyage was Ft. Lauderdale, Florida.

5

16.    Defendant Rolls-Royce, PLC ("RRPLC") is a British business entity with its principal place of business in England.  RRPLC has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida.  RRPLC specifically targeted and solicited Carnival to purchase the Mermaid propulsion products and services in the State of Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services in Florida.

17.    Defendant Rolls-Royce AB ("RRAB") is a Swedish business entity with its principal place of business in Kristenehamn, Sweden.  RRAB was formerly known as Kamewa AB.  RRAB has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and in this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida.  RRAB held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout this State.  RRAB has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

6

18.     Defendant Rolls-Royce North American, Inc. ("RRNAH") is a Delaware corporation with its principal place of business in Chantilly, Virginia.  RRNAH has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State and with a registered agent in Florida. RRNAH has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

19.     Defendant Rolls-Royce Commercial Marine, Inc. ("RRCM") is a Delaware corporation with its principal place of business in Chantilly, Virginia, and a registered agent for service of process in Florida.  RRCM has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State.  RRCM has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

20.     Defendant Converteam SAS ("Converteam") f/k/a Alstom Power Conversion SA, is a French business entity with its principal place of business in Belfort, France.  Converteam has conducted and now conducts business in the State of Florida, and has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida.  Converteam held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida and marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout

this State. Converteam has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

21.     Defendant Converteam Inc., f/k/a Alstom Power Conversion Inc., is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Converteam Inc. has conducted and now conducts business in the State of Florida through its Merchant Marine Service office located in Miami and maintains a registered agent in Florida. Converteam Inc. has maintained systematic and continuous business relationships in this District and this State, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. Converteam Inc. held itself out as a world leader in marine propulsion technology and specifically targeted and solicited Carnival to purchase the Mermaid pod propulsion products and services in Florida. Converteam Inc. marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout this State. Converteam Inc. has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*.

22.     Each of the named Defendants has subjected itself to jurisdiction in this Court by virtue of engaging in substantial and not isolated activities within this District; operating, conducting, engaging in, and/or carrying on a business or business venture in this District; having an office or agency in this District; committing a tortious act within this District; and/or by breaching warranties in this state by failing to perform acts required by warranties to be performed in this District. The Defendants' tortious and other actionable conduct described

herein was specifically directed to, performed in, relied upon, and caused significant damage to Carnival in the Southern District of Florida.

23.    At all material times, the foreign Rolls-Royce and Converteam Defendants acted through their United States subsidiaries, which exist merely as a conduit for the purpose of doing the business of the foreign entities and have acted as the agents of the foreign entities in dealings with Carnival.

24.    The Rolls-Royce Defendants are merely alter egos of one another.  At all material times, all Rolls-Royce Defendants acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, and sharing common ownership and directorships.  Accordingly, the corporate distinctions between the Rolls-Royce Defendants should be disregarded by the Court, and the Rolls-Royce Defendants should be considered as one legal entity.

25.    The Converteam Defendants are merely alter egos of one another.  At all material times, all Converteam Defendants acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, and sharing common ownership and directorships.  Accordingly, the corporate distinctions between the Converteam Defendants should be disregarded by the Court, and the Converteam Defendants should be considered as one legal entity.

**Principal Actors**

26.    As more fully set forth below, the following individuals, among others, from Rolls-Royce and Converteam made direct and specific false, misleading and/or negligent misrepresentations to Carnival regarding the design, development, testing, deployment, quality,

performance, reliability, cost-efficiency and operational benefits of the Mermaid propulsion system to Carnival.  Rolls-Royce: George Lowe, Duncan Forbes, Mats Johansson, Andreas Fokkens, Stig Lonngren, Lars Holmstrom, Gunnar Lindhe, Thomas Henriksen, Andrew Pilkington, Ian Ritchey and Gunnar Styrud, among others.  Converteam: Brian Pope, Patrick Kron, Jean-Philippe Nicod, Pierre Bilger, and Jean-Marc Taillardat, among others.

### The Mermaid Consortium

27.    Prior to 1997, Kamewa (now Rolls-Royce AB) and Alstom Power Conversion, SA (now Converteam SAS) entered into a joint venture for the design, development, manufacture, sales, marketing, service and repair of an innovative podded propulsion system for seagoing vessels which it marketed and sold under the brand name "Mermaid."  They claim to have been cooperating in a pre-study on pod propulsion systems as early as 1992.  The joint venture was referred to by its participants as the Mermaid Consortium; and when dealing with Carnival, Rolls-Royce and Converteam made clear to Carnival that they were acting jointly as members of the Mermaid Consortium.

28.    The cruise ship industry is a major consumer of pod propulsion systems. Accordingly, the Mermaid Consortium developed a marketing strategy and engaged in business activity intended to induce the Florida based cruise industry, including Carnival, to invest in, purchase, use and/or maintain the Mermaid pod system in cruise vessels.  The Mermaid Consortium has at all material times continuously engaged in a course of conduct within this District intended to convince the decision making executives acting for the Florida based cruise industry, including Carnival, to utilize the Mermaid pod system on cruise vessels constructed in various shipyards around the world.

10

29.     Rolls-Royce and Converteam analyzed the cruise ship industry, its operation, and its needs.  Plans to introduce an optimized pod propulsion system suitable for speeds up to about 30 knots were allegedly developed sometime in 1994.  However, the first Mermaid was not actually constructed until August 1999.  It is now apparent that, in their ill-planned collective effort to bring the Mermaid to market on an expedited basis, Rolls-Royce and Converteam failed to undertake the necessary research, development and testing to ensure the proper functioning of the Mermaid.  In other words, they placed a poorly designed and untested product into the stream of commerce.

30.     The Mermaid Consortium has been assisted at all material times in its joint venture efforts by the Defendants, RRPLC, RRNAH, RRCM and Converteam Inc.   The Mermaid Consortium joint venturers and these Defendants have acted in concert to induce the sale and continued utilization of the Mermaid pod system by Florida based cruise businesses, including Carnival, and to continue the sale of parts and service to the exclusion of other suppliers, at inflated costs and on unconscionable terms.

### Cunard and the Queen Mary 2: A Tradition of Excellence

31.     Carnival operates numerous cruise ship brands, including the prestigious Cunard Line.  Cunard has built its business reputation on an unwavering commitment to delivering its passengers the highest quality service and best oceanic travel experience possible.  Repeat passengers constitute a significant portion of Cunard's business.

32.     In order to fulfill this commitment to its passengers, Carnival has invested heavily in its fleet of modern, state of the art Cunard ocean liners featuring the highest quality technology available.  Prior to June 1998, Carnival decided to build the world's largest luxury

ocean liner to enhance its Cunard fleet.  On March 10, 2000, Carnival signed a letter of intent for the construction of the QM2 at Chantiers de l'Atlantique, a French shipyard and non-party to this Complaint.  The formal contract for the construction of the QM2 was signed on November 6, 2000.

33.     The quality of the performance of Cunard's new flagship vessel was a critical consideration.  The QM2 was to be 1,132 feet in length with a beam of 135 feet, featuring thirteen decks capable of providing unparalleled luxury services to 3,056 passengers. Additionally, with an anticipated cost of over $800 million, Carnival wanted the QM2 to not only offer the best aspects of cruising, but to do so using the most advanced technological features in order to deliver the highest level of performance available in the cruise ship industry.

34.     A cruise ship's performance is inextricably tied to the quality of its propulsion system. Accordingly, Carnival desired to employ the most technologically advanced, highest quality, most efficient propulsion system available for its flagship QM2.  Thus, Carnival decided to employ a podded propulsion system.

35.     The shipbuilding contract for the QM2 specified that podded propulsion would be utilized, but the manufacturer of the pods for the vessel was not determined.  Carnival was provided with a makers list identifying three potential manufacturers, one of whom was the Mermaid Consortium.   After extensive and direct marketing by the Mermaid Consortium, Carnival ultimately approved Mermaid as the supplier for the pods in April of 2001.

**Rolls-Royce and Converteam Conceal the Truth and Deceive Carnival**

36.     By the late 1990's, Carnival's plans to build the QM2 were well known within the cruise ship industry.  In early 2000, Carnival met with several European shipyards to discuss the

project.  One of these shipyards was Chantiers de l'Atlantique ("CAT"), a subsidiary of Alstom.

These meetings focused on the general design developed by Carnival, and Carnival stated its

intention to fit the QM2 with a podded propulsion system.

37.     Mermaid was, at the time, not well known to Carnival.  Carnival had never used

the Mermaid propulsion units on any of its vessels.  But Carnival had prior experience with the

rival ABB Azipod system.

38.     From the time Rolls-Royce and Converteam became aware of the QM2 project,

they engaged in an extensive and aggressive marketing program intended to convince Carnival to

employ the Mermaid propulsion system on the QM2 rather than the ABB Azipods.

Representatives of the Mermaid Consortium, either directly or through their agents, made

numerous false representations of material fact regarding the design, development, testing,

deployment, quality, performance, reliability, cost-efficiency and operational benefits of the

Mermaid propulsion system to Carnival.  These representations were made during the Mermaid

Consortium's marketing presentations in Miami and other locations, as well as over the

telephone and through the mail directed at Carnival executives in Miami, Florida.  Rolls-Royce

and Converteam knew that these false and misleading representations would be, and were in fact,

critical inducements to Carnival in choosing Mermaid over the rival Azipod.  Based upon these

false and misleading representations, Carnival considered the Mermaid pods to be a fully

developed product and approved Mermaid as the manufacturer for the QM2's podded propulsion

units.

39.     Rolls-Royce and Converteam also emphasized the long history of their respective

companies in producing superior electrical and mechanical equipment for ship propulsion

applications as part of their effort to convince Carnival to choose the Mermaid over the Azipod. The numerous failures of the Mermaids, and Rolls-Royce and Converteam's complete inability to repair the Mermaids so that they can perform as warranted, speak to the lack of veracity of this representation.

40.      By letter dated October 10, 2000 and sent to Miami, Florida; Brian Pope, president of Alstom Power Conversion North America, provided Capt. James Drager of Carnival with brochures advertising and marketing the Mermaid podded propulsion system.   These materials specified the evolution of the Mermaid product and highlighted the differences between the Mermaid and ABB Azipod systems.   In one of these brochures, Converteam, on behalf of the Mermaid Consortium, specifically represented that the bearing design employed in the Mermaid pods had been successfully used in over 1000 other products, and was superior to that on the ABB Azipods.   The brochure indicated that the existing, well-proven technology used in the Mermaid pods would be reliable and would not suffer from bearing problems.   Brian Pope, in his letter, further represented that Converteam was increasing its U.S. presence by manufacturing motors, generators and pods in the US and providing extensive service and support from the U.S.   These specific representations made by the Mermaid Consortium as to the superior quality of the Mermaid Pods over the rival ABB Azipods were intended to, and did induce Carnival to select the Mermaid pods for the QM2.

41.      The Defendants also touted the superior performance capabilities of the Mermaid, representing that it could be operated without restrictions, thus maximizing the performance of the cruise ships.   This too proved to be false.   In fact, the numerous problems with the Mermaid

pods caused Carnival to develop and institute limitations upon the operation of the Mermaid in an effort to reduce the operational stresses and reduce the number of failures.

42.     In a document provided to John Hopkins, Mats Johansson represented that many of the pod repairs could be performed underwater, including changing the propeller shaft seal.  Mr. Johansson also represented that Kamewa took part in developing the "Transpod," which is a special device designed to enable a complete mounting/dismounting of the whole Mermaid underwater with the ship afloat, thus avoiding the need to dry dock the ship for pod repairs.  Mr. Johansson also represented that important pod components were designed with 100% redundancy, with repair and exchange enabled from either inside the pod or underwater.  Additional benefits of the Mermaid pods represented to John Hopkins by Mr. Johansson included:

    a.     Increased payload capacity

    b.     Increased propulsion system efficiency

    c.     Increased propulsion system redundancy

    d.     Increased propulsion system reliability

    e.     Reduced power usage

    f.     Reduced total fuel consumption and exhaust emissions

    g.     Reduced noise and vibration levels

    h.     Reduced vessel turning circle

    i.     Improved maneuverability during crash stop

    j.     Improved harbor maneuverability

Further, Mr. Johansson represented that these benefits had been confirmed through model testing and through experiences on Celebrity's MILLENNIUM cruise ship.  Mr. Johansson then concluded his description of the Mermaid pod advantages by stating "The concept and the product is there. The power is available.  Yards and designers: Go ahead and use it, the benefits will be yours!"

43.     In specific reliance on the false and misleading material representations made by Rolls-Royce and Converteam, both directly and through their agents, Carnival approved the selection of four 21.5 MW Mermaid pods for installation on the QM2.  But for the false and misleading material representations made by Rolls-Royce and Converteam, Carnival would not have purchased the Mermaid propulsion system.  Because of the numerous material misrepresentations and deceitful acts and practices of Rolls-Royce and Converteam, it was impossible for Carnival to evaluate adequately the advisability of purchasing the Mermaid.

44.     Shortly after Mermaid was approved as the pod supplier, Carnival learned that the Mermaid pods installed on other cruise ships began to experience serious and recurrent failures.  By July 2003, Carnival was aware of a total of 22 separate Mermaid pod failures on 7 different cruise ships.  Rolls-Royce and Converteam specifically assured Carnival that they had no reason to be concerned with similar problems occurring on the QM2 because the Mermaid pods for the QM2 had been designed and modified to eliminate such problems.

45.     These numerous and catastrophic Mermaid failures caused significant concern at Carnival that the Mermaid pods already selected for the QM2 would not perform as represented by the Mermaid Consortium.  In fact, Carnival was so concerned that they explored numerous possibilities for changing the QM2 design to utilize a propulsion system other than Mermaid.

16

Investigations were undertaken to analyze the potential for installing the ABB Azipod system, or even conventional shaft propulsion in place of the Mermaid pods.  And at a meeting in Miami on March 3, 2003, due to concerns about the reliability of the Mermaid pods, Carnival specifically discussed with the shipyard the potential to replace the Mermaids with ABB Azipods or shaft line propulsion.

46.     Throughout the manufacture of the Mermaid pods for the QM2, numerous problems were experienced with quality control, including at the SKF facility where the bearings were manufactured, at Rolls-Royce AB's facility in Kristinehamn, Sweden, and at Converteam's facility in Nancy, France where the pods were assembled.  This lack of quality control was most evident at Converteam's Nancy facility, where Carnival was forced to place a full time employee solely to monitor the myriad quality control issues during the Mermaid assembly.

47.     In January 2003, during the Factory Acceptance Test for the QM2's Mermaid pods, an unusual excessive noise was detected in Pod #4 causing the tests to be immediately abandoned.  After investigation, it was determined that Rolls-Royce and Converteam had failed to remove the packing tape from the pod roller bearings prior to assembly.  This clear error resulted in the testing for pod #4 being prematurely halted and caused damage to the pod.  This glaring failure is but one example of the lack of acceptable quality control during the manufacture and installation of the Mermaid pods.

48.     Another example of lack of care during the manufacture of the pods was the discovery in November 2002 of an excessive amount of paint from the pod housing flaking and contaminating the lubrication system within the pods.  During the pod assembly, it was also

discovered that the assembly factory in Nancy, France was working from a different, outdated set of drawings than those used in designing the Mermaid pods in Kristinehamn, Sweden.

49.     As a result of the numerous quality control issues, in the Spring of 2003 the Mermaid pods, which had already been assembled and delivered, were sent back to the Rolls-Royce and Converteam facilities, and/or their subcontractors' facilities, to be fully stripped, cleaned and reassembled under strict cleanliness and quality controls.  This caused the pods to be delivered late to the shipyard, so much so that the QM2 was originally floated out of dry-dock for testing without the Mermaid pods installed and later had to be brought back to the dry-dock to fit the Mermaid pods before sea trials.

50.     As problems continued occurring on other Mermaid equipped vessels and throughout the development, manufacture, testing and installation of the Mermaid pods for the QM2, Rolls-Royce and Converteam organized numerous meetings and presentations designed to appease Carnival's concerns and to induce Carnival to install the Mermaid units rather than switch to a different propulsion system, and to take delivery of the vessel.  Rolls-Royce and Converteam went to great lengths, including, but not limited to, multiple briefings and presentations, faxes, email correspondence and telephone calls to Carnival to quell the growing concerns that the Mermaid propulsion units were not viable propulsion systems and to assure Carnival that the Mermaid pods would be fully supported, monitored, and repaired.  Numerous letters were sent directly from Converteam and Rolls-Royce executives to Micky Arison in Miami reassuring him and Carnival that the problems occurring throughout the development and building of the pods would be remedied and that they would deliver pod propulsion units of the highest quality.   Several examples of these communications were letters sent to Micky Arison

18

by Pierre Bilger, Chairman and CEO of Alstom, on December 4, 2002; by Patrick Boissier, Chairman and CEO of Alstom Marine, on December 3, 2002; and by George Lowe on November 14, 2002.

51.    Rolls-Royce and Converteam also made numerous representations as to why the Mermaid pods for the QM2 would not suffer from the same problems plaguing the Mermaid pods on other cruise ships.  Rolls-Royce and Converteam represented to Carnival that the Mermaid pods designed for the QM2 were the "New Generation" of Mermaid pods.  In fact, in one presentation, after identifying the various causes of bearing damage, Rolls-Royce, acting as a representative of the Mermaid Consortium, specifically stated "The actions address all identified causes and so will prevent a recurrence of any of the problems."

52.    At a meeting in Miami on March 6, 2003, Duncan Forbes and Andreas Fokkens promised Gerry Ellis and Ian Gaunt that all necessary steps had been taken to provide fully reliable equipment through the implementation of design changes to the pods following the failure of the thrust bearings on Celebrity's INFINITY cruise ship.  When specifically asked by Carnival representatives whether Roll-Royce was confident in the reliability of the product, they responded that the corrective actions and modifications based on previous failures provide a "good result and a robust product."

53.    At a meeting in St. Nazaire on May 15, 2003, Rolls-Royce representatives Lars Holmstrom, Mats Johansson, Gunnar Lindhe, and Thomas Henriksen again represented that bearing problems would not be encountered on the QM2.  These representations were made to a number of Carnival representatives, including Stephen Payne, John Hopkins, John Grace, Milton Gonzales, Steve Storey and Soren Krogsgaard among others.  At that meeting Carnival

specifically asked "Is everybody confident that the problem of the thrust bearing is now solved?" Rolls-Royce responded, "Yes."

54.     And again at a meeting at Rolls-Royce AB's facility in Kristinehamn, Sweden on July 9, 2003, Mats Johansson, Patrick Kron and Stig Lonngren made numerous representations to Stephen Payne specifically to assure him and Carnival that the QM2 Mermaid pod design was different from the design experiencing difficulties on the Millennium class vessels, and would not suffer from the same problems.  These representations included, but are not limited to:

a.     that the higher speed of the QM2 increased the forces on the pods, necessitating a substantially larger bearing arrangement, which made it clear that the QM2 design would have to be different than the Millennium design;

b.     that the QM2 Mermaid pods use improved lubrication utilizing higher viscosity oil, security filters, cross-flow lubrication, and improved piping;

c.     that the QM2 Mermaid pod bearings would be coated with "no wear" coating using a patented metal mixed with diamond like carbon;

d.     that the QM2 pods would contain an improved bearing locking arrangement and increased spring force in pod bearing arrangement;

e.     that the QM2 pods would contain increased radial clearance in the bearings;

f.     that the QM2 pods would contain increased cooling capacity; and

g.     that the QM2 pods would feature optimized relocation of vibration sensors.

55.     At the same meeting, Mats Johansson, Patrick Kron, and Stig Lonngren represented to Stephen Payne that the bearing lifetimes in the QM2 Mermaid pods would be 139,000 running hours for the radial bearing and 179,000 running hours for the thrust bearings.

20

This bearing life calculation equates to a minimum of 15 – 20 years.  This representation is grossly inaccurate.  Experience has proven that the Mermaid pod bearings must be changed at a minimum every 3 years.  In fact, failure of one of the QM2's thrust bearings installed in November 2005 was discovered after that bearing was in operation for less than one year.  Through their experience with Mermaid pods installed on other cruise ships, Rolls-Royce and Converteam knew that that bearing life was significantly less than what they represented to Carnival.

56.    At a meeting that took place on August 14, 2003, Duncan Forbes, George Lowe and Stig Lonngren presented to Ian Gaunt, Stephen Payne, John Hopkins and Richard Vie a comparison of Millennium and QM2 bearings.  They represented numerous improvements to the QM2 bearings, including lower contact stresses, improved L10 life of 179,000 hours, reduced vibrations, and increased internal clearance.  These representations that the QM2 bearings would have a longer life than the bearings on the Millennium class ships proved to be false.  And Rolls-Royce knew or should have known at the time they made these representations that they were false because Rolls-Royce in reality did not know why the bearings were failing prematurely.  The representations were made with the intention to induce Carnival into believing that the bearing problems were solved and to accept delivery of the QM2 with the Mermaid pods.

57.    Rolls-Royce and Converteam made additional representations about the quality of the Mermaid pods for the QM2 at two meetings of particular importance that were directed specifically at Carnival's upper management to induce them to accept delivery of the QM2 with the Mermaid pods despite the myriad problems experienced on other cruise ships.  One was held on November 3, 2003 at Alstom's headquarters in Paris.  At this meeting, various Rolls-Royce

21

representatives, including Andreas Fokkens, Duncan Forbes, Mats Johansson, Stig Lonngren, Thomas Henriksen, Andrew Pilkington, Ian Ritchey and Gunnar Styrud, and Converteam representatives, including Jean-Marc Taillardat, jointly represented to numerous Carnival representatives, including Peter Ratcliffe, Richard Vie, Ian Gaunt, Steven Payne, John Hopkins and others, that the identified problems with the Mermaid pods on other cruise ships would not occur on the QM2, either due to a solution to the problem being found or because of a difference in the design of the QM2 pods.  The other meeting was held just before delivery on December 12, 2003 at the shipyard.  At this meeting, with George Lowe, Ian Ritchey, Stig Lonngren, Mats Johansson and Andreas Fokkens present, Duncan Forbes made a number of representations to Ian Gaunt, John Hopkins, Peter Ratcliffe and Richard Vie, among others, that the QM2 Mermaid pods were fit for their intended purpose and that bearing failures such as those on the Millennium class ships would not occur.  Mr. Forbes represented that a "superbolt" used on the QM2 to secure the inner race components would prevent a bearing failure similar to the one that occurred on the INFINITY in 2003.  He also represented that the bearing stresses on the QM2 pods were reduced because the torque during azimuthing was restricted, and due to modifications made to the pod speed control system and thrust bearing design.   Mr. Forbes said that these modifications, combined with improved race material, would prevent failures because the peak stresses were not high enough to produce cracking in the bearings.

58.    These representations that the Mermaids had been modified from the design on Celebrity's cruise ships to specifically tailor the units to the QM2 and eliminate problems with the pods were specifically intended to induce, and did induce Carnival to accept delivery of the QM2 with the Mermaids.  However, the Mermaid, and specifically the Mermaid design for the

QM2, was in fact merely an unproven, experimental propulsion concept at the time these representations were made to Carnival.

59.     At a meeting in Saint Nazaire, France on March 19, 2003, Carnival specifically made Rolls-Royce aware of the fact that, due to the special transatlantic purpose of the QM2, the fundamental reliability of the pods was essential, and that if there was a reliability issue with the pods, the damage to Cunard would not be repairable.  Representatives of Rolls-Royce and Converteam in meetings in Florida, as well as other locations, falsely claimed that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads that would be encountered by the QM2's North Atlantic operations.  This has been proven untrue by the repeated problems experienced by the defective Mermaid pods installed on the QM2.

60.     In December 2003, and in specific reliance on the false and misleading material representations made by Rolls-Royce and Converteam, either directly or through their agents, Carnival accepted delivery of the QM2 with the Mermaid propulsion system.  But for the false and misleading material representations made by Rolls-Royce and Converteam, Carnival would not have believed that the Mermaid propulsion system was fit for its intended purpose, and Carnival would have rejected delivery of the QM2 as unsuited for the service for which it was ordered.  And, at the time that they made the false and misleading representations, Rolls-Royce and Converteam knew that these false and misleading representations would be, and were in fact, critical inducements to Carnival's decision to accept delivery of the QM2.

## Mermaid Pods on the QM2 Fail to Perform

61.     Leading up to the QM2's first dry-docking in November 2005, Rolls-Royce made numerous representations to Carnival regarding improvements to the materials and design of the Mermaid pods, and particularly the pod bearings.  At an August 1, 2005 meeting at which George Lowe was present, Duncan Forbes presented Rolls-Royce's findings from investigations into the thrust bearing failures on Celebrity's Millennium class ships, in order to support Rolls-Royce's recommendation to fit a modified bearing design at the November 2005 QM2 dry dock. These representations were made to several Carnival representatives, including Peter Ratcliffe, Charles Arkinstall, Ian Gaunt, Lars Nordin and Mike Lewis.  Duncan Forbes stated that along with SKF, the producer of the steel for the bearings, Rolls-Royce had developed a new, stronger steel material that would prevent the cracking in the bearings that was causing many failures of other Mermaid pods.  At this meeting, Mr. Forbes also represented that improvements to the QM2 modified bearing design included: a common inner race, shortened and strengthened cage support rings, 50% less dynamic stress, improved tolerance of misalignment, close control over the build, reduced MDCR thrust, and improved cleanliness during build.  He then recommended that all bearings be replaced on the QM2 during the November dry dock, and assured that the work could be completed within the scheduled time frame.  Thus, at the urging of Rolls-Royce, Carnival replaced all bearings on the QM2's four Mermaid pods during the ship's dry-dock in November 2005, at significant cost to Carnival.  Despite the fact that Rolls-Royce had induced Carnival to accept delivery of the QM2 by representing that the bearings would have a life expectancy of 139,000 running hours for the radial bearing and 179,000 running hours for the thrust bearings, the QM2 bearings had only been in operation for less than two years (which

equates to a maximum of 17,520 hours) when Rolls-Royce urged that they be replaced.  At this meeting, Peter Ratcliffe reemphasized to George Lowe and Duncan Forbes Carnival's desire to maintain a 5-year dry dock schedule.

62.     Examination of the bearings removed during the 2005 dry-dock for the first time revealed spalling of the "No Wear" DLC coating on the bearing rollers and indications of electrical current arcing across the bearings.  Also, butterfly cracks were discovered in the inner and outer races of the bearings.   These conditions all reduce the bearing life, thus requiring more frequent replacement of the bearings than as represented by Rolls-Royce and Converteam prior to selection and delivery of the Mermaid pods.

63.     Rolls-Royce and Converteam represented that the new bearings and added insulation installed during the 2005 dry-dock would remedy all of these problems.   These representations proved to be false, as all of the problems continued and even progressed after the dry-dock repairs.

64.     In November 2006, the QM2 returned to dry-dock to repair one pod that was damaged due to grounding.   The repaired pod incorporated the latest bearing design and composition.   Leading up to this dry-dock, Rolls-Royce representatives, including Mats Johansson and Duncan Forbes, again strongly recommended that Carnival replace the thrust bearings on all of the other Mermaid pods with new bearings composed of an even more advanced material and design.   One such recommendation occurred during a telephone conversation on June 6, 2006, where Rolls-Royce's Duncan Forbes represented to Carnival's Richard Vie that all of the QM2 Mermaid pod bearings should be replaced during the 2006 dry dock with newer sleeve forged bearings, which he represented would be more reliable.   This

25

recommendation was made following a Rolls-Royce investigation into a bearing failure on another ship equipped with Mermaid pods where the failure was represented to have been due to erroneous manufacture of the bearings by SKF.  Rolls-Royce was unable to definitively determine whether the QM2 bearings had been subject to the same alleged manufacturing errors.  Mr. Forbes made this recommendation to exchange the bearings knowing that the bearings on the QM2 at the time had been installed only 6 months earlier.  Rolls-Royce also refused to guarantee that the Mermaid bearings would last for a minimum of the 5 year standard dry dock cycle.  Carnival understood this strong recommendation to replace the bearings, coupled with the refusal to guarantee even a minimum life span for the bearings, to mean that the Mermaid bearings would not last until the next scheduled dry dock unless they were replaced during the 2006 docking.

65.     Rolls-Royce again recommended that all bearings be changed at the 2006 dry dock when, in a telephone conversation on September 30, 2006 with Carnival's Lars Nordin, Rolls-Royce's Joakim Karas and Stig Lonngren informed Mr. Nordin that the bearings removed from the damaged QM2 pod exhibited signs of electrical damage.   This, Rolls-Royce represented, presented further support for their position that all bearings should be exchanged at the 2006 dry dock.  Subsequent boroscopic examinations of the bearings in the three undamaged QM2 Mermaid pods undertaken in the fall of 2006 showed evidence of electrical damage to those bearings as well.

66.     Thus, based upon the representations made by Duncan Forbes, Stig Lonngren, Joakim Karas and other Rolls-Royce representatives during meetings, presentations, telephone conversations and other communications, Carnival replaced the thrust bearings on all of the

26

Mermaid pods after only one year in operation. Carnival was again forced to incur significant costs to replace the bearings, for both excessive labor and materials costs.

67. Examination of the bearings removed during the 2006 dry-docking revealed that the thrust bearing in Mermaid pod number 4 had failed and would have caused a catastrophic pod failure within a relatively short period of time if it had continued in operation after the dry-dock. The raceway of the bearing was completely cracked with large pieces of metal missing. This bearing had been in service for only one year. Additionally, butterfly cracking, spalling of the "No Wear" DLC coating, and damage from electrical discharge across the bearings were again observed. It was clearly apparent that the repairs undertaken during the 2005 dry-docking had not fixed any of the problems with the Mermaid pods, contrary to the representations of Rolls-Royce and Converteam.

68. Rolls-Royce and Converteam once again claimed to have fixed the bearing problems with the new bearing material and design, and the electrical arcing problem with increased insulation and improved earthing arrangements. They represented to Carnival that the problems would not occur again. These representations again proved to be false, as the electrical and bearing problems continue to this day.

69. Additionally, during the 2006 dry-docking it was discovered that cracks were beginning to form in the exciter frames where they connect to the pod housing. These cracks continued to worsen during operation of the QM2 after the 2006 dry-dock. Converteam acknowledged that there is a problem with cracking in the exciter frame, but refused to recognize that the problem is due to a deficient design and refused to redesign a new exciter frame suitable

27

to withstand the stresses found within the Mermaid pods.  The exciter frame is the original design installed in the QM2 Mermaid pods.

70.    Additional supports were welded to the cracked exciter frames during various port calls as a temporary fix to the problem.  These temporary welds repeatedly failed due to extremely difficult working conditions within the pods, which prevented proper welding procedures.  But more stiffeners were continually added to the exciter frames to prevent the exciter frames from completely breaking loose inside of the pods, which would have resulted in a catastrophic failure of the Mermaid pods.  Due to these significant failures of the exciter frames, as well as the defective damper bars, Carnival was forced to advance the QM2's next dry dock from 2009 to 2008.  A permanent solution to the exciter frame problems was supposedly implemented at the 2008 dry-dock.  But the effectiveness of the "solution" is yet to be determined, particularly in light of Rolls-Royce and Converteam's previous "solutions" which have failed to solve any of the Mermaid pod problems.  These repairs constitute another significant cost incurred by Carnival as a result of the faulty and defective Mermaid pods provided by Rolls-Royce and Converteam.

71.    Yet another major problem with the defective Mermaid pods developed during the operation of the QM2 after the 2006 dry-dock.  This problem involved cracking and breaking of the damper bars due to a flaw in Converteam's original design.  This problem was first noticed when a broken piece of a damper bar was found lying on the bottom of the pod during an inspection.  This discovery has necessitated the inspection of the damper bars at nearly every port of call.  Numerous other failures of damper bars have been discovered on a regular basis. Several temporary repairs have been conducted in an attempt to fix the problem, but Converteam

28

has yet to definitively identify the cause of the cracking.  Due to these significant failures of the damper bars, as well as the defective exciter frames, Carnival was forced to advance the QM2's next dry dock from 2009 to 2008.

72.     At the 2008 dry-dock, Converteam implemented repairs that were represented to eliminate this problem by applying a ceramic coating to the damper bars.  This supposed permanent repair has also proven to be ineffective.  Recently the ceramic coating on the damper bars has also begun to show signs of cracking, indicating that the problem has not been fixed.  Once again, the repairs to the Mermaid pods have proven to be ineffectual.  Carnival incurred substantial costs to effect these repairs to the damper bars, and will continue to incur substantial repair costs in the future because the 2008 "permanent" repairs have failed.

73.     At a meeting in Gothenburg, Sweden on April 26, 2007, Rolls-Royce representatives Mats Johansson, Duncan Forbes, Stig Lonngren and Gunnar Styrud presented a full analysis of bearings removed during the QM2's 2005 and 2006 dry docks, and reviewed the design changes to the Mermaid pods and benefits that would be realized by those design changes.  This presentation was made to Carnival representatives Lars Nordin and Richard Vie.  The Rolls-Royce representatives detailed the new steel material, a new bearing cage, additional rollers, and increased bearing clearance in the "enhanced" bearing.  Rolls-Royce represented the increased bearing life and reduced contact stresses that would be gained by utilizing the "enhanced" bearing.  They also introduced a new Rolls-Royce pod monitoring program that they marketed to Carnival to purchase and utilize on the QM2.  Rolls-Royce recognized that the bearing design installed on the QM2 during her 2006 dry dock was not adequate for its purpose,

and thus presented this new "enhanced" design to induce Carnival to replace the QM2 bearings during the next dry dock.

74.     On November 9, 2007, Rolls-Royce's Stig Lonngren made another presentation to Carnival representatives, including Richard Vie, detailing even further improvements to the Mermaid pod design and discussing problems being encountered by electrical discharge in the bearings.  At this presentation, Stig Lonngren detailed the improvements made to the quality of steel used in the bearings and identified why the material improvements to the Grade Q steel would resolve existing problems of premature bearing deterioration.  He also identified other improvements to the "enhanced" pod design, including change to a steel roller cage for the bearings, longer rollers in forward bearing, an additional roller in forward bearing, a new aft bearing house, and increased axial clearance in aft bearing.  Rolls-Royce specifically stated in this presentation that the enhanced non-drive end bearing design would have a L10 life of 261,000 hours (which equals over 30 years).  At the time this presentation was made, Rolls-Royce knew or should have known that this bearing life figure was false because they had no testing or evidence whatsoever indicating that the bearing could last even a fraction of that time. This presentation was designed to induce Carnival to purchase and install the "enhanced" bearings at the QM2's November 2008 dry dock.  In specific reliance on this and other similar representations made by Rolls-Royce and Converteam, the bearings on the QM2 were again replaced at the 2008 dry dock.

75.     Numerous problems continue to plague the Mermaid pods on the QM2.  The expected bearing life is drastically shorter than what was represented to Carnival by Rolls-Royce and Converteam to induce Carnival to accept delivery of the ship.  As a result, Carnival is forced

to dry-dock the vessel every two or three years to replace the bearings rather than implement a standard five-year dry-dock schedule. Each additional dry-dock requires Carnival to expend substantial amounts for parts, labor, and other costs that would otherwise not be necessary if the Mermaid pods functioned as warranted. Each additional dry-dock results in the loss of revenue generating cruises and other consequential losses.

76.     The QM2 also continues to experience problems due to electrical discharge across the bearings, and the exciter frames and damper bars continue to suffer from unwanted cracking. Also, spalling of the slewing bearing has recently been discovered in at least one of the Mermaid pods.

77.     It has become evident based upon these numerous defects and failures that the Mermaid pods installed on the QM2 are defective products that are not fit for their intended purpose. The representations that the Mermaid propulsion system was a reliable propulsion system and was fit for use on a transatlantic ocean liner were entirely false. Despite having been reassured, again and again, that the problems with the Mermaid pods had been identified and solved, the same problems and new problems continue to arise.

78.     Since these problems have first appeared, Rolls-Royce and Converteam have engaged in an ongoing conspiracy to cover up and prevent Carnival from discovering the fact that the Mermaids suffer from numerous design and manufacturing defects so that Carnival would accept delivery of the QM2. Upon information and belief, Rolls-Royce and Converteam deceived, and conspired to deceive, Carnival into believing that the problems encountered with the Mermaids on the QM2 were resolved, even though Rolls-Royce and Converteam knew that,

since such problems were not actually resolved, it was substantially certain that the pods would continue to experience failures.

79.     Upon information and belief, Rolls-Royce and Converteam knew that each time they pretended to fix a failed pod, it would in fact break again, because Rolls-Royce and Converteam in reality had no solution whatsoever for the complex design and manufacturing defects plaguing the Mermaids installed on the QM2, nor did they want to incur the cost of undertaking a complete redesign.

80.     Upon information and belief, Rolls-Royce and Converteam knowingly decided to deceive Carnival into believing that the Mermaids could be made to function properly instead of admitting to Carnival that the Mermaids suffered from numerous complex design and manufacturing defects that the Defendants could not or would not solve.

81.     As a direct and proximate result of Rolls-Royce and Converteam's fraudulent and deceitful conspiratorial acts, together with their multiple breaches of implied warranties and violations of Florida Statutes, Carnival has suffered, and will continue to suffer, millions of dollars in damages due to costs of repairs, maintenance and analysis.  Also, the QM2 will be forced to undertake dry-dockings at least every three years throughout the life of the ship to replace the Mermaid pod components rather than the standard five year dry-dock schedule that would have been employed if the Mermaid pods functioned as warranted.  Carnival will suffer millions of dollars of damages resulting from these additional dry-dockings, as well as other consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

82.    In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs directly attributable to the wrongful conduct of each of the named Defendants. Plaintiffs are entitled to recover their attorneys' fees and costs from each of the Defendants, pursuant to Florida. Statute Sections 501.211, 501.2105, and 817.41(6).

## Count I

### Breach of Implied Warranty of Fitness for Particular Purpose against Rolls-Royce, Converteam, and the Mermaid Consortium

83.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

84.    Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid pod propulsion system within the meaning of Section 672.315 of the Florida Statutes.

85.    Rolls-Royce and Converteam have had numerous direct contacts with Carnival in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls-Royce and Converteam informed Carnival that the Mermaid was a proven, reliable, state-of-the-art propulsion system with a design, technology and features that were superior to the other pod system on the market and conventional propulsion systems used on cruise ships, and which was especially suited for the particular operational needs of Carnival and the QM2, including but not limited to extending the time between dry-dockings and reducing the length and maintenance work necessary during dry-dockings.

86.    At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, the Defendants had reason to know, and did know, of the particular purposes for

which, and operational conditions in which, Carnival intended to operate the Mermaids on the QM2.  Specifically, Rolls-Royce and Converteam knew that the QM2 would be operated primarily as a transatlantic ocean liner and would be subject to the increased stresses and punishing conditions present in the North Atlantic.

87.    At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, these Defendants had reason to know that Carnival was relying in good faith upon Rolls-Royce and Converteam's skill and judgment to select or furnish a suitable propulsion system for the particular purposes and operational conditions in which Carnival intended to use the QM2.

88.    Carnival did in fact rely upon Rolls-Royce and Converteam's skill, judgment and representations regarding the Mermaids when deciding to select the Mermaids for installation on the QM2 and in deciding to accept delivery of the QM2 with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

89.    Rolls-Royce and Converteam's representations created an implied warranty that the Mermaids were fit for the particular operational needs of Carnival and the QM2 pursuant to Section 672.315 of the Florida Statutes.

90.    Rolls-Royce and Converteam have breached their implied warranties to Carnival, in that the Mermaid pods installed on the QM2 were defective, unreliable, and unsuitable for the particular purpose for which Carnival purchased them.  In particular, the Mermaids have a defective bearing design and numerous defective electrical components which render the units subject to constant and continuous maintenance problems and premature repair and replacement of various component parts, resulting in more frequent dry-dockings at significant costs to

34

Carnival and damages resulting from a reduction in the number of revenue generating cruises the QM2 can sail.  In fact, the Mermaids delivered by Rolls-Royce and Converteam to Carnival are unsuitable for use on a transatlantic ocean liner because of significant design and manufacturing defects that neither Rolls-Royce nor Converteam have been able to repair.  As a result, the Mermaid is subject to constant and continuous problems requiring additional, extended, and expensive dry docks.  In addition, it is apparent from the problems experienced with the Mermaid pods that Mermaid propulsion technology is not a proven technology, and cannot be made to perform as warranted.

91.    As a direct and proximate result of Rolls-Royce and Converteam's breaches of the implied warranty of fitness for a particular purpose, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Accordingly, Carnival has suffered substantial damages including, but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

**Count II**

**Breach of Implied Warranty of Merchantability against Rolls-Royce, Converteam, and the Mermaid Consortium**

92.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

93.     Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid and are "merchants" of Mermaids within the meaning of Section 672.314 of the Florida Statutes.

94.     Rolls-Royce and Converteam have had numerous contacts with Carnival in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls-Royce and Converteam informed Carnival that the Mermaid was a proven, reliable, state-of-the-art propulsion system fit for the ordinary purpose of propelling cruise ships.

95.     Pursuant to Section 672.314 of the Florida Statutes, Rolls-Royce and Converteam's numerous and direct affirmations to Carnival about the Mermaid propulsion system created implied warranties of merchantability in Carnival's agreement to install Mermaids on the QM2 and in deciding to accept delivery of the QM2 with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

96.     Rolls-Royce and Converteam breached their implied warranties of merchantability because the Mermaid is not fit for the ordinary purpose of propelling a cruise ship.  In fact, the Mermaids delivered by Rolls-Royce and Converteam to Carnival are entirely unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls-Royce nor Converteam have been able to repair.  As a result, the Mermaid is subject to constant and continuous problems requiring additional, extended and expensive dry docks.  In addition, it is clear that Mermaid propulsion technology is not yet proven technology, and Rolls-Royce and Converteam have been unable to make the Mermaid fit for the ordinary purpose of propelling a cruise ship.

36

97.    As a result of Rolls-Royce and Converteam's breaches of warranty, Carnival has paid millions of dollars for defective pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  As a direct and proximate result of Rolls-Royce and Converteam's breaches of warranty, Carnival has in fact suffered substantial damages, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count III

### Negligent Misrepresentation against Rolls-Royce, Converteam, and the Mermaid Consortium

98.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

99.    As more fully set forth in paragraphs 1 through 82 above, in the course of their business, Rolls-Royce and Converteam, either directly or through their agents, made numerous representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking requirements and operational benefits of the Mermaid propulsion system to Carnival, including but not limited to:

a.    that extensive research, testing, and development had been performed upon the Mermaids specifically for the QM2;

b.    that the problems experienced with Mermaid pods on other cruise ships would not occur on the QM2 due to advanced design and materials;

37

c.    that the Mermaid employed more advanced technology than the rival Azipod unit, specifically by utilizing an SKF bearing with a CARB design and a "no wear" coating, an enhanced cooling system, improved silver/silver slip rings, the ability to lock the shaft in position with a shaft brake, and numerous other advantages;

d.    that the Mermaids would increase propulsion system efficiency and reduce total fuel consumption;

e.    that the Mermaids would provide increased propulsion system reliability and reduced maintenance and repair costs;

f.    that the Mermaids would produce reduced noise and vibration levels;

g.    that the Mermaids would provide improved maneuverability and stopping capability;

h.    that the Mermaids were capable of underwater mounting/dismounting of the complete Mermaid unit without the need to dry dock the vessel;

i.    that the Mermaid shaft seals were of the same design as seals which had been used throughout the maritime industry for years, and were thus more reliable than those used on the rival Azipod unit;

j.    that the mechanical components (including bearings, seals, couplings, etc.) employed in the Mermaid had a long history of use in the shipbuilding industry, and were thus more reliable than those used on the rival Azipod unit;

k.    that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by operation in the harsh conditions of the North Atlantic;

38

l.   that the seals and bearings employed in the Mermaid constituted a superior technical solution to those employed in the rival Azipod unit;

m.   that the bearings would have a life of 139,000 running hours for the radial bearings and 179,000 running hours for the thrust bearings;

n.   that the Mermaid could be operated without any restrictions that would negatively impact the ship's performance at sea; and

o.   that the Mermaid did not suffer from design and manufacturing defects that Rolls-Royce and Converteam were unable to remedy; that the Mermaid could be effectively repaired to perform as represented by its manufacturers, the Defendants herein; and that Rolls-Royce and Converteam would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

100.   These statements made by Rolls-Royce and Converteam to Carnival concerned material facts.

101.   These statements made by Rolls-Royce and Converteam to Carnival were false when made.

102.   In the exercise of reasonable care under the circumstances, Rolls-Royce and Converteam should have known that these statements were false at the time they were made.

103.   At the time Rolls-Royce and Converteam made these misrepresentations, they intended and/or expected that Carnival would rely upon these false representations in ordering the Mermaid pods for installation on the QM2.

104.    Carnival reasonably and justifiably relied on these misrepresentations to its detriment. But for the misrepresentations by Rolls-Royce and Converteam, Carnival would not have placed the Mermaid pods on the QM2.

105.    As a direct and proximate result of the negligent misrepresentations of Rolls-Royce and Converteam, Carnival has been damaged in that it paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.   Carnival has suffered substantial damages as a result of the negligent misrepresentations of Rolls-Royce and Converteam, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.   Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count IV

**Fraud in the Inducement by Rolls-Royce, Converteam, and the Mermaid Consortium**

106.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

107.    As more fully set forth in paragraphs 1 through 82 above, in order to induce Carnival to select the Mermaid propulsion system for installation on the QM2 and to induce Carnival to accept delivery of the QM2 with the Mermaid propulsion system after numerous and significant failures of the Mermaid systems on other cruise ships, Rolls-Royce and Converteam made numerous representations of material facts regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking

requirements, and operational benefits of the Mermaid to Carnival, including but not limited to those identified in paragraph 99 of this Second Amended Complaint.

108.    Rolls-Royce and Converteam knew or should have known that these representations of material fact were false at the time they were made, and/or made these representations without knowledge of their truth or falsity.

109.    Rolls-Royce and Converteam made these misrepresentations of material facts with the intent that Carnival rely on the misrepresentations and to induce Carnival to act on them by selecting the Mermaid propulsion system for installation on the QM2.

110.    Rolls-Royce and Converteam made these misrepresentations of material facts with the intent that Carnival rely on the misrepresentations and to induce Carnival to act on them by accepting delivery of the QM2 with the Mermaid propulsion systems despite the numerous and significant problems experienced by other cruise ships equipped with the Mermaid pods.

111.    Carnival reasonably and justifiably relied on these misrepresentations of material fact to its detriment.  But for the misrepresentations of material fact by Rolls-Royce and Converteam, Carnival would not have placed the Mermaid propulsion system on the QM2.

112.    As a direct and proximate result of the fraudulent inducements of Rolls-Royce and Converteam, Carnival has been damaged, in that it finds itself with pod propulsion systems that do not function properly, and neither Rolls-Royce nor Converteam has been able to correct the deficiencies.  Carnival has suffered substantial damages caused by the fraud of Rolls-Royce and Converteam, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be

replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

**Count V**

**Fraudulent Misrepresentation by Rolls-Royce, Converteam, and the Mermaid Consortium**

113.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

114.     As more fully set forth in paragraphs 1 through 82 above, from 2000 to the present, Rolls-Royce and Converteam have made numerous representations of material fact to Carnival, including but not limited to those identified in paragraph 99 of this Second Amended Complaint.

115.     Rolls-Royce and Converteam knew these representations of material fact were false at the time they were made, and/or made these representations knowing that they were without knowledge of the statements' truth or falsity.

116.     Rolls-Royce and Converteam made these representations with the intent that Carnival would rely on the false statements.

117.     Carnival reasonably and justifiably relied on the misrepresentations to its detriment.

118.     As a direct and proximate result of the fraud of Rolls-Royce and Converteam, Carnival has spent millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Carnival has suffered substantial damages caused by the fraud of Rolls-Royce and Converteam, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.

Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count VI

### Deceptive and Unfair Trade Practices against Rolls-Royce, Converteam, and the Mermaid Consortium

119.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

120.    Carnival is a "consumer" as defined by Section 501.203(7) of the Florida Statutes.

121.    Rolls-Royce and Converteam's actions in soliciting, marketing, promoting, advertising, offering, providing, selling and distributing the Mermaid propulsion system for the QM2 to Carnival in Florida constitute "trade or commerce" under Section 501.203 of the Florida Statutes.

122.    Rolls-Royce and Converteam's numerous misrepresentations to Carnival in Florida and other places regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry-docking requirements and operational benefits of the Mermaid, as more fully set forth in paragraphs 1 – 82 above, constituted unconscionable, unfair and deceptive acts or practices in the conduct of trade or commerce in violation of Section 501.204 of the Florida Statutes.

123.    As a result of Rolls-Royce and Converteam's unlawful practices in violation of Section 501.204 of the Florida Statutes, Carnival has been injured in Florida and incurred substantial actual damages in Florida.

124.    As a direct and proximate result of Rolls-Royce and Converteam's unlawful practices in violation of Section 501.204, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Accordingly, Carnival is entitled to actual damages.  Additionally, under Sections 501.211 and 501.2105 of the Florida Statutes, Carnival is entitled to recover from Rolls-Royce and Converteam reasonable attorneys' fees and costs incurred in this action.

### Count VII

**Negligent Testing, Inspecting, Repairing, and/or Servicing against Rolls-Royce, Converteam, and the Mermaid Consortium**

125.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

126.    After delivery of the QM2, Rolls-Royce and Converteam directly, and through their subsidiaries in Florida acting as their agents, had duties to test, inspect, repair and service the Mermaid pods in numerous instances including, among others, as set forth in paragraphs 1 through 82 above.

127.    Rolls-Royce and Converteam breached their duties to Carnival by failing to properly test, inspect, repair and service the Mermaid pods in the numerous instances as set forth above.

128.    As a direct and proximate cause of Rolls-Royce and Converteam's negligent testing, inspecting, repairing and/or servicing, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Carnival has suffered substantial damages caused by the negligence of Rolls-Royce and Converteam, including but not limited to, costs of repair, maintenance, analysis and

consequential and incidental damages.  Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

<u>**Count VIII**</u>

**Breach of Warranty of Workmanlike Performance against Rolls-Royce, Converteam, and the Mermaid Consortium**

129.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

130.    As a separate cause of action under the general maritime law, Carnival avers that Rolls-Royce and Converteam, directly and through their subsidiaries in Florida, which acted as their agents, breached their warranties of workmanlike performance for failure to perform inspections and repairs of the Mermaids aboard the QM2 in a workmanlike manner.

131.    After delivery of the QM2, Rolls-Royce and Converteam held themselves out as competent and able to inspect, diagnose and repair problems with operation and performance of the Mermaids.

132.    During each dry dock of the QM2 in 2005, 2006 and 2008, Carnival was forced to enter into agreements with Converteam and Rolls-Royce for work to be undertaken during the dry dockings.  These agreements detailed the scope of repair and service work to be undertaken during the dry docks, the personnel and equipment required for the work, and a time table in which the work would be completed, among other things.  These agreements for the provision of repairs and service to the QM2 give rise to implied warranties of workmanlike performance.

45

133.    Rolls-Royce and Converteam have repeatedly failed to inspect, diagnose and repair problems with the Mermaids in a competent and workmanlike manner in numerous instances including, among others, as set forth in paragraphs 1 through 82 above.

134.    As a direct and proximate result of Rolls-Royce and Converteam's breach of the warranty of workmanlike performance, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.   As a direct and proximate result of Defendants' breach of the warranty of workmanlike performance, Carnival has suffered substantial damages, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages. Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.  Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

## Count IX

### Negligent Professional Services against Rolls-Royce

135.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

136.    In the course of its business, Rolls-Royce supplies cruise ship operators, such as Carnival, with its professional advice and services regarding the operation and maintenance of the Mermaid and the dry docking requirements of the Mermaid.  Rolls-Royce provides its professional skills and services for the design, construction, servicing, maintaining, testing and repairing of the Mermaids on these cruise ships.

46

137.    Rolls-Royce has had, at all material times, a duty of reasonable care to Carnival to provide professional services in accordance with the standard of care used by similar professionals in the community under similar circumstances, concerning the reliability and operational efficiency of the Mermaid, which include, but are not limited to, designing, constructing, servicing, maintaining, testing and repairing problems with the Mermaids on the QM2.

138.    Rolls-Royce employs and/or retains engineers, architects and other professionals in the field of naval engineering and architecture, and holds itself out as competent and able to design, construct, test, inspect, diagnose and repair problems with operation and performance of the Mermaids, but has failed to do so in numerous instances, including, among others, as set forth in paragraphs 1 – 82 above.

139.    After the delivery of the QM2, Rolls-Royce, directly and through its subsidiaries in Florida acting as its agents, designed, serviced, maintained, tested and repaired for Carnival the Mermaids on the QM2.   The design, servicing, maintenance, tests and repairs of the Mermaids on the QM2 were performed by and through Rolls-Royce's employees, agents and representatives.

140.    Rolls-Royce, through its employees, agents and representatives, breached its duty to Carnival by failing to provide reasonable professional services in the design, testing, inspection, diagnosis and repairing problems with the operation and performance of the Mermaids.  The Mermaids have failed to perform their intended purpose as they were improperly designed, serviced, maintained, tested and repaired.

141.   As a direct and proximate result of Rolls-Royce's negligent professional services, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.   Carnival has suffered substantial damages, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.   Additionally, the defective Mermaid pods may have to be replaced with properly functioning units.   Plaintiffs are entitled to recover these damages from Rolls-Royce due to its wrongful acts.

## Count X

### False, Misleading and Deceptive Advertising and Sales by Rolls-Royce, Converteam, and the Mermaid Consortium

142.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

143.   Rolls-Royce and Converteam's actions in advertising, marketing, promoting, providing, distributing, and selling the Mermaid to Carnival constitute "misleading advertising" under Section 817.40(5) of the Florida Statutes.

144.   For several years, until Rolls-Royce and Converteam finally induced Carnival to select the Mermaid for the QM2, Rolls-Royce and Converteam in their advertising, marketing, promoting, and selling the Mermaid, made numerous false representations of material fact in Florida regarding the quality, reliability and cost-efficiency of the Mermaid.   These promotional materials were disseminated to the public, particularly the South Florida based cruise ship industry, in a variety of ways, including through the mail and at industry-wide conferences such as the Seatrade conference in Miami.

145.    Rolls-Royce and Converteam knew or should have known that these representations were false at the time they made them.

146.    Carnival reasonably and justifiably relied on the misrepresentations to its detriment.  But for Rolls-Royce and Converteam's misrepresentations, Carnival would not have selected the Mermaid for installation on the QM2.

147.    As a direct and proximate result of Rolls-Royce and Converteam's unlawful practices in violation of Section 817.41(1) of the Florida Statutes, Carnival has incurred substantial damages.

148.    As a direct and proximate result of Rolls-Royce and Converteam's false, misleading and deceptive advertising and sales, Carnival has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Pursuant to Section 817.41(6) of the Florida Statutes, Carnival is entitled to recover reasonable attorneys' fees, costs, and actual damages.

### Count XI

### Civil Conspiracy against Rolls-Royce and Converteam

149.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82 above as if fully set forth herein.

150.    Rolls-Royce and Converteam entered into an agreement to defraud and deceive the passenger cruise industry, and specifically Carnival, as to the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid.

49

151.     Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive Carnival regarding their ability to make the defective Mermaid function as represented.

152.     Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive Carnival by refusing to disclose to Carnival the true nature of the design and manufacturing defects from which the Mermaid suffered, which information was known to Rolls-Royce and Converteam.

153.     Rolls-Royce and Converteam engaged in tortious acts in furtherance of the above agreements.

154.     Rolls-Royce and Converteam conducted overt acts in furtherance of the tortious agreements into which they entered by actively defrauding and deceiving Carnival on numerous instances as set forth in the general allegations and counts above.

155.     The overt acts taken by Rolls-Royce and Converteam in the furtherance of the tortious conspiracies described herein were the direct and proximate cause of substantial damages to Carnival, including but not limited to, costs of repair, maintenance, analysis and consequential and incidental damages.

## **DEMAND FOR JURY TRIAL**

156.     Plaintiffs hereby demand a trial by jury in this action.

**WHEREFORE,** Plaintiffs seek:

157.     A finding of liability as to each of the Defendants for the causes of action alleged in this Second Amended Complaint;

158.    An Order from this Court directing the Defendants to replace the defective Mermaids with pods that function properly, or to pay the cost of doing so;

159.    An award of actual and consequential damages;

160.    An award of damages to compensate Plaintiffs for loss of past and future profits;

161.    An award of attorneys' fees and costs pursuant to Florida Statute Sections 501.211, 501.2105, and 817.41(6); and

162.    Pre and post-judgment interest.

Dated: December 4, 2009

                          Respectfully submitted,


                          s/ Maria Isabel Hoelle_____
                          Maria Isabel Hoelle, Esquire
                          *Florida Bar No. 0381871*
                          MHoelle@frvf-law.com
                          Antonio J. Rodriguez, Esquire
                          ajr@frvf-law.com
                          George J. Fowler, III, Esquire
                          fow@frvf-law.com
                          *PRO HAC VICE*
                          **FOWLER RODRIGUEZ VALDES-FAULI**
                          355 Alhambra Circle, Suite #801
                          Coral Gables, Florida 33134
                          Tel.: (786) 364-8400
                          Fax: (786) 364-8401
                          www.frvf-law.com
                          *Attorneys for Plaintiffs Carnival Corporation, Carnival PLC and Cunard Line, Ltd*

51

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 4, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                         ___s/Maria Isabel Hoelle_____

<u>**SERVICE LIST**</u>

CASE NO. 08-23318-CIV-SEITZ/O'SULLIVAN

UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF FLORIDA

**Larry A. Stumpf, Esquire**
**Jared Lopez, Esquire**
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard
Suite 1300
Miami, Florida 33131
Telephone: (305)371-6421
Facsimile: (305) 371-6322
*Attorneys for Defendants Rolls-Royce PLC, Rolls-Royce AB, Rolls-Royce North American*
  *Holdings, Inc. and Rolls-Royce Commercial Marine, Inc.*
Via transmission of Notices of Electronic Filing generated by CM/ECF

**Anthony P. Strasius, Esquire**
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3800 Bank of America Tower
100 SE Second Street
Miami, Florida 33131
Telephone: (305)374-4400
Facsimile: (305)579-0261
*Attorneys for Defendants Converteam, SAS and Converteam, Inc.*
Via transmission of Notices of Electronic Filing generated by CM/ECF